54 A.3d 813

A.D.P., PLAINTIFF–APPELLANT, v. EXXONMOBIL
RESEARCH AND ENGINEERING COMPANY,
DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued January 18, 2012—Decided October 26, 2012.

520

Before Judges YANNOTTI, ESPINOSA and KENNEDY.

*Sara Fern Meil* argued the cause for appellant.

*John B. McCusker* argued the cause for respondent (*McCusker, Anselmi, Rosen & Carvelli, P.C.*, attorneys; *Mr. McCusker* and *Michael R. Futterman*, on the brief).

The opinion of the court was delivered by ESPINOSA, J.A.D.

In this appeal, we consider whether summary judgment was properly granted to an employer that required a long-term employee whose job performance was satisfactory to submit to random alcohol testing and terminated her employment when a test showed she had used alcohol. Because the record revealed that the basis for the testing and termination was the employee's voluntary disclosure that she was an alcoholic and not the result of inadequate job performance, the imposition of these conditions constituted direct evidence of discrimination. As a result, the burden of persuasion shifted to the employer, requiring it to show that the employment actions taken would have occurred even if it

had not considered plaintiff's disability, *see McDevitt v. Bill Good Builders, Inc.*, 175 *N.J.* 519, 525, 816 *A.*2d 164 (2003), a burden it failed to satisfy as a matter of law. We therefore conclude that summary judgment dismissing plaintiff's disability discrimination claim was inappropriate.

Many of the facts here are undisputed. As to those on which the parties disagree, we view the facts in the light most favorable to plaintiff. *See R.* 4:46–2(c).

In 2007, defendant ExxonMobil Research and Engineering Company (ExxonMobil or defendant), required plaintiff A.D.P., an employee of twenty-nine years, to sign an agreement that required her to totally abstain from alcohol and submit to random breathalyzer tests as a condition of her continued employment. At the outset, we emphasize a fact that informs our analysis. It is undisputed that plaintiff was not subject to testing and termination here pursuant to a last chance agreement.[1] A.D.P. was not the subject of any pending or threatened employment or disciplinary action. Indeed, the evidence includes testimony from one ExxonMobil manager that the imposition of these conditions was unrelated to her job performance and testimony from a Human Resources Advisor that plaintiff's employment would have been terminated when she failed a breathalyzer test even if she had

---

[1] "Last chance agreements," come into play after an employee incident that calls for discipline and have been described as "a contract between employer and employee to suspend disciplinary action pending a probationary period in which the employee is afforded a chance to improve his or her performance." *Boise Cascade Corp. v. Paper Allied–Indus., Chem. & Energy Workers, Local 7–0159*, 309 *F.*3d 1075, 1078 n. 3 (8th Cir.2002). In the event the employee violates the terms of the last chance agreement, the employer is free to impose the disciplinary action that was suspended or some other discipline appropriate to the circumstances, including termination. *See Watson v. City of E. Orange*, 175 *N.J.* 442, 815 *A.*2d 956 (2003) (per curiam); *see e.g., In re Jackson*, 294 *N.J.Super.* 233, 683 *A.*2d 203 (App.Div.1996), *certif. denied*, 149 *N.J.* 141, 693 *A.*2d 110 (1997); *see also Dow Chem. Co. v. Local No. 564, Int'l Union of Operating Eng'rs*, 246 *F.Supp.*2d 602, 607 n. 2 (S.D.Tex.2002) *aff'd*, 83 *Fed.Appx.* 648 (5th Cir.2003).

been performing in the top one-percent of her group.[2] The evidence therefore supports a conclusion that A.D.P. was subject to these requirements and fired when a breathalyzer test revealed alcohol use because she voluntarily disclosed she was an alcoholic and enrolled in an inpatient rehabilitation program. This admission triggered ExxonMobil's Alcohol and Drug Use Policy (the Policy) which, although facially discriminatory, ExxonMobil defended as reasonable.

The motion judge agreed, granting summary judgment and dismissing plaintiff's complaint, which alleged that (1) defendant violated the New Jersey Law Against Discrimination (LAD), *N.J.S.A.* 10:5-1 to –49, by discriminating against her because of her disability; and (2) that her termination violated public policy, *see Pierce v. Ortho Pharm. Corp.*, 84 *N.J.* 58, 72, 417 *A.2d* 505 (1980). As noted, summary judgment was erroneously granted on plaintiff's LAD claim. However, we conclude, for the reasons that follow, that summary judgment was appropriate to dismiss her *Pierce* claim.

Plaintiff was initially hired by a predecessor company as a research technician in 1978. She received promotions in 1983, 1985, 1987, 1990, 1993, 1998 and 2000. ExxonMobil evaluates its employees on an annual basis, ranking them in order from highest performing employees to the lowest. Through much of her career, A.D.P. was consistently ranked as a top performer. Hans Thomann, who later supervised plaintiff, described her in the earlier years as "the go-getter. She was the go-to person to get things done."

In 2004, plaintiff's husband died. She suffered from depression thereafter, as noticed by her co-workers, and other medical conditions. Nonetheless, in April 2005, she was promoted to the

---

[2] Defendant has presented evidence which, it argues, shows that plaintiff's performance suffered prior to her termination and that there were suspicions that she abused alcohol prior to her disclosure. However, as noted, in our review of the summary judgment order, we view the evidence in the light most favorable to plaintiff.

position of Senior Research Associate. In this new position, her ranking dropped but she remained in the middle third of employees.

ExxonMobil had a "performance improvement plan" for employees who failed to meet performance expectations, typically reserved for the bottom tenth percentile of employees, which could result in termination if the employee failed to improve. Plaintiff was never put on such a plan.

The Policy that ExxonMobil applied to plaintiff states, in part:

Exxon Mobil Corporation is committed to a safe, healthy, and productive workplace for all employees. The Corporation recognizes that alcohol, drug, or other substance abuse by employees will impair their ability to perform properly and will have serious adverse effects on the safety, efficiency and productivity of other employees and the Corporation as a whole.... Being unfit for work because of use of drugs or alcohol is strictly prohibited and is grounds for termination of employment. ..

The Corporation recognizes alcohol or drug dependency as a treatable condition. Employees who suspect they have an alcohol or drug dependency are encouraged to seek advice and to follow appropriate treatment promptly before it results in job performance problems .

No employee with alcohol or drug dependency will be terminated due to the request for help .. or because of involvement in a rehabilitation effort.

On August 17, 2007, plaintiff voluntarily disclosed to a nurse at ExxonMobil that she was an alcoholic and intended to check herself into a rehabilitation program to address her alcohol dependency and depression. Plaintiff was not the subject of any pending or threatened disciplinary action. There was no evidence that she had consumed alcohol or was intoxicated at work, let alone that she had violated ExxonMobil's Policy by being "unfit for work because of use of drugs or alcohol[.]" And, she had not been advised that her job performance had fallen to an unacceptable level. Both Katharine Ramos, defendant's Products Research Human Resources Advisor, and Rose Villarreal, a Human Resources Manager, testified they first learned that plaintiff was an alcoholic when she self-reported and was hospitalized.

Plaintiff was hospitalized at Carrier Clinic from August 20 to September 8, 2007, and participated in outpatient treatment after-

ward at Hunterdon Medical Center. Following treatment, plaintiff met with defendant's representatives and signed an after-care contract on October 29, 2007. The after-care contract was required by the Policy, which provides in pertinent part:

> *Any employee returning from rehabilitation will be required to participate in a company-approved aftercare program.* If an employee violates provisions of the employee Alcohol and Drug Use policy, appropriate disciplinary action will be taken.... If an employee suffering from alcohol or drug dependency refuses rehabilitation or fails to respond to treatment or fails to meet satisfactory standards of effective work performance, appropriate disciplinary action, up to and including termination, will be taken.
>
> [ (Emphasis added).]

Plaintiff testified that she signed the contract because she felt "threatened" that if she did not sign it, she would lose her job. Linda Hofmann, a planning manager, testified that it was her understanding that, once plaintiff self-reported her alcoholism, she was required to sign the contract as part of ExxonMobil's after-care program. When asked if A.D.P. was required to sign the contract because of any performance issues, Hofmann stated, "No. Unrelated."

The after-care contract provides in part:

> As [defendant's] employee, I am willing to fulfill the following conditions to further my recovery from chemical dependency and *reassure my employer of my commitment to recovery:*
>
> *I will maintain total abstinence from alcohol* and drugs not prescribed by a physician familiar with my state of recovery....
>
> I will actively participate in: (1) treatment for chemical dependency for the duration of the Primary Treatment Program; (2) After-Care including *clinical substance testing for a minimum of two (2) years* after completion of the Primary Treatment Program; and, (3) *monitoring for an additional three years.*
>
> I will follow the treatment plan identified for me by my Treatment Provider(s) and my [ ] After-Care Counselor.
>
> ....
>
> When released to return to work *I will maintain acceptable work performance and will be subject to periodic and unannounced alcohol and drug testing.* The frequency of drug and alcohol testing will be determined on an individual basis taking into consideration my rehabilitation progress and the type of chemical dependency for which I received treatment. *A positive alcohol or drug test result or refusal to submit to periodic testing is grounds for discipline which is most likely to be termination of employment.*

. .
[ (Emphasis added).]

It is undisputed that employees not identified as alcoholics were not required to sign such a contract and were not subject to alcohol testing except for cause, as set forth in the Policy:

[ExxonMobil] may also require employees to submit to ... alcohol and drug testing *where cause exists to suspect alcohol or drug use,* including workplace incidents. Unannounced periodic or random testing will be conducted *when an employee meets any one of the following conditions: has had a substance abuse problem, or is working in a designated position identified by management, a position where testing is required by law, or a specified executive position.* A positive test result or refusal to submit to a drug or alcohol test is grounds for disciplinary action, including termination.

[ (Emphasis added).]

Aside from her admitted alcoholism, none of the conditions identified as a basis for testing applied to plaintiff. Between October 29, 2007 and August 20, 2008, ExxonMobil administered nine random breathalyzer tests to plaintiff, all of which she passed. Two days after she passed the last of these tests, plaintiff was required to take additional breathalyzer tests. The laboratory report describes the tests as "random," indicating they were administered pursuant to the after-care contract she was required to sign. No evidence was presented that she was intoxicated or that her behavior that day gave defendant reasonable cause to believe she had been drinking alcohol at work. The breathalyzer tests administered on August 22, 2008 produced blood alcohol concentration (BAC) readings of .047 and .043.[3]

Plaintiff's employment was terminated on August 26, 2008. Katharine Ramos gave the following testimony regarding plaintiff's termination:

Q. Why did the company terminate [A.D.P.]?

A. Violating the alcohol and drug policy.

Q. That was because she had the positive test?

A. Yes.

[3] These readings are below the threshold BAC of 0.08 set by *N.J.S.A.* 39:4–50(a) for driving under the influence.

Q. Is there any other reason that the company terminated [A.D.P.]?

A. No.

Q. Was she terminated for performance reasons?

A. No.

Q. Was she about to be terminated for performance reasons?

A. No.

Q. To your knowledge, had anyone discussed terminating her for performance reasons?

A. No.

. . . .

Q. ... If [A.D.P.] had been performing in the top 1 percent of her group, would she still have been terminated for failing the test?

A. Yes.

Hans Thomann, plaintiff's supervisor during 2006 and 2007, also testified that he never recommended that A.D.P. be terminated and never intended to do so. Therefore, the record before the motion judge supported the conclusion that plaintiff did not violate the condition of her after-care contract that required her to "maintain acceptable work performance."

Plaintiff filed the complaint in this action, alleging disability discrimination and wrongful termination. After discovery was completed, plaintiff filed a motion for summary judgment and defendant filed a cross-motion for summary judgment. The motion judge denied plaintiff's motion, a decision she does not appeal, and granted summary judgment to defendant, dismissing the complaint in its entirety.

In this appeal, plaintiff argues that the motion judge erred in dismissing her LAD claim because ExxonMobil admittedly subjected her to additional terms and conditions of employment because of her disability in violation of the LAD and that no legally justifiable basis was provided for such disparate treatment. She also argues that the court erred in dismissing her *Pierce* claim because the forced alcohol testing violated a clear public policy.

## I

All motions for summary judgment are judged pursuant to the standards set forth in *Rule* 4:46–2 and the guidance provided in *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 539–40, 666 *A.*2d 146 (1995). Applying the same standard as the trial court, *ibid.*, we determine whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law[,]" *R.* 4:46–2(c); *see also Myers v. AT & T,* 380 *N.J.Super.* 443, 451–52, 882 *A.*2d 961 (App.Div.2005), *certif. denied,* 186 *N.J.* 244, 892 *A.*2d 1290 (2006).

Our analysis of plaintiff's LAD claim begins with the controlling language of the statute. The LAD declares that it is an unlawful employment practice or an unlawful discrimination "[f]or an employer, because of the ... disability ... of any individual, ... to discharge ... or to discriminate against such individual ... in terms, conditions or privileges of employment[,]" *N.J.S.A.* 10:5–12(a), "unless the nature and extent of the disability reasonably precludes the performance of the particular employment[.]" *N.J.S.A.* 10:5–4.1. Further, the LAD does not "prevent the termination or change of the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment[.]" *N.J.S.A.* 10:5–2.1.

█ Plaintiff alleges that the imposition of a standard of conduct based solely upon her disability and her termination for non-compliance with that standard constituted disparate treatment in violation of the LAD. These claims may be proven by either direct or circumstantial evidence.

"[D]irect evidence of intentional discrimination is hard to come by." *Price Waterhouse v. Hopkins,* 490 *U.S.* 228, 271, 109 *S.Ct.* 1775, 1802, 104 *L.Ed.*2d 268, 301 (1989) (O'Connor, J., concurring). The "entire purpose" for the formulation of the burden-shifting

*McDonnell Douglas*[4] methodology was "to compensate for [that] fact[.]" *Ibid.; see also Bergen Commercial Bank v. Sisler,* 157 *N.J.* 188, 209–10, 723 *A.*2d 944 (1999).

A plaintiff who relies upon circumstantial evidence to prove unlawful disability discrimination must present *prima facie* evidence of discrimination, i.e., that (1) she was handicapped within the meaning of the law; (2) she "had been performing [ ] her work at a level that met the employer's legitimate expectations;" (3) she "nevertheless had been required to labor under conditions that were unreasonably different from those of other employees, had been transferred, or had been fired; and (in the case of discriminatory transfer or discharge) (4) the employer had sought another to perform the same work after [she] had been removed from the position." *Maher v. N.J. Transit Rail Operations, Inc.,* 125 *N.J.* 455, 480–81, 593 *A.*2d 750 (1991); *see also Gerety v. Atl. City Hilton Casino Resort,* 184 *N.J.* 391, 399, 877 *A.*2d 1233 (2005); *Jansen v. Food Circus Supermarkets, Inc.,* 110 *N.J.* 363, 382, 541 *A.*2d 682 (1988). In contrast to the burden associated with direct evidence, the proof necessary to establish a *prima facie* case in the *McDonnell Douglas* framework is "rather modest[.]" *Myers, supra,* 380 *N.J.Super.* at 453, 882 *A.*2d 961 (internal citation and quotation marks omitted).

Defendant does not dispute that plaintiff satisfied her burden of presenting a *prima facie* case of discrimination. Accordingly, if the *McDonnell Douglas* analysis applied, the burden of production would shift to defendant to present a legitimate nondiscriminatory reason for its actions. *See Jansen, supra,* 110 *N.J.* at 382, 541 *A.*2d 682. If this burden of production is satisfied, the

---

[4] *McDonnell Douglas Corp. v. Green,* 411 *U.S.* 792, 802, 93 *S.Ct.* 1817, 1824, 36 *L.Ed.*2d 668, 677–78 (1973). *See Peper v. Princeton Univ. Bd. of Trs.,* 77 *N.J.* 55, 82–83, 389 *A.*2d 465 (1978) (applying Title VII analysis to LAD claim alleging sex discrimination in discharging plaintiff); *Clowes v. Terminix Int'l, Inc.,* 109 *N.J.* 575, 595–96, 538 *A.*2d 794 (1988) (applying Title VII analysis to LAD claim alleging discriminatory termination of plaintiff because of alcoholism, a physical handicap).

burden returns to plaintiff to prove that the stated reason was pretextual. *Id.* at 382–83, 541 *A.*2d 682. In this analysis, the burden of proof always remains with plaintiff. *Id.* at 383, 541 *A.*2d 682.

■ However, in the less common case in which there is direct evidence of discrimination, the *McDonnell Douglas* analysis does not apply. *Healey v. Southwood Psychiatric Hosp.,* 78 *F.*3d 128, 131 (3d Cir.1996) (finding error in District Court's application of *McDonnell Douglas* to case involving facially discriminatory policy); *Snyder v. Norfolk S. Ry., Corp.,* 463 *F.Supp.*2d 528, 534 (E.D.Pa.2006), *aff'd,* 271 *Fed.Appx.* 150 (3rd Cir.2008) (finding *McDonnell Douglas* inapplicable because plaintiff presented a case of direct discrimination).

■ Direct evidence of discrimination is evidence "that an employer placed substantial reliance on a proscribed discriminatory factor in making its decision to take the adverse employment action[.]" *McDevitt, supra,* 175 *N.J.* at 527, 816 *A.*2d 164 (citing *Price Waterhouse, supra,* 490 *U.S.* at 244–45, 109 *S.Ct.* at 1787–88, 104 *L.Ed.*2d at 284).[5] "The evidence produced must, if true, demonstrate not only a hostility toward members of the employee's class, but also a direct causal connection between that hostility and the challenged employment decision." *Bergen Commercial Bank, supra,* 157 *N.J.* at 208, 723 *A.*2d 944; *see also McDevitt, supra,* 175 *N.J.* at 528, 816 *A.*2d 164.

■■ In determining whether a plaintiff has presented direct evidence, "a court must consider whether a statement made by a

---

[5] Although there is a lack of consensus among federal courts as to the application of the *Price Waterhouse* principles to various statutory causes of action following the United States Supreme Court's decision in *Desert Palace, Inc. v. Costa,* 539 *U.S.* 90, 123 *S.Ct.* 2148, 156 *L.Ed.*2d 84 (2003), our Supreme Court has interpreted "mixed motive" cases and their direct evidence requirement to be broadly applicable to discrimination cases without regard to the statutory context. *Myers, supra,* 380 *N.J.Super.* at 461, 882 *A.*2d 961; *see also O'Brien v. Telcordia Techs., Inc.,* 420 *N.J.Super.* 256, 263–65, 20 *A.*3d 1154 (App.Div.2011), *certif. denied,* 210 *N.J.* 479, 45 *A.*3d 984 (2012).

decisionmaker associated with the decisionmaking process actually bore on the employment decision at issue and communicated proscribed animus." *McDevitt, supra,* 175 *N.J.* at 528, 816 *A.*2d 164 (citing *Fakete v. Aetna, Inc.,* 308 *F.*3d 335, 339 (3d Cir.2002)). Such proof is established by evidence "of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude." *Fleming v. Corr. Healthcare Solutions, Inc.,* 164 *N.J.* 90, 101, 751 *A.*2d 1035 (2000) (internal citation and quotation marks omitted); *Jackson v. Georgia–Pacific Corp.,* 296 *N.J.Super.* 1, 19, 685 *A.*2d 1329 (1996) (internal citation and quotation marks omitted), *certif. denied,* 149 *N.J.* 141, 693 *A.*2d 110 (1997).

Thus, stray remarks unrelated to the decisional process, such as an employer's comment that "everyone over 35 should be sacked" and references to older employees as "little old ladies" and "old cows," have been characterized as circumstantial evidence, while "a scrap of paper saying, 'Fire Rollins—she is too old' " was an example of direct evidence. *Bergen Commercial Bank, supra,* 157 *N.J.* at 208–09, 723 *A.*2d 944 (quoting *Castle v. Sangamo Weston, Inc.,* 837 *F.*2d 1550, 1553, 1558 n. 13 (11th Cir.1988)). The emphasis is upon the quality of proofs, rather than their nature as direct or circumstantial evidence. The proffered evidence in *McDevitt* was that an employer's president nodded his head when his secretary was asked why plaintiff had been fired and answered that he was "too old." *McDevitt, supra,* 175 *N.J.* at 523, 816 *A.*2d 164. The Court ruled that, if accepted as an adoptive admission, this gesture could constitute direct evidence of unlawful discrimination. *Id.* at 531–32, 816 *A.*2d 164.

The evidence A.D.P. relies upon does not suffer from any ambiguity. The Policy's requirements of total abstinence and a minimum of two years of random testing were only imposed upon employees who were identified as alcoholics, demonstrating "hostility toward members of the employee's class." Proof of the "direct causal connection between that hostility and the challenged employment decision" was provided by Ramos, who testified that

A.D.P.'s employment was terminated solely because she had violated the Policy and not because of any deficiency in her job performance. Indeed, Ramos testified that plaintiff would have been fired after failing the breathalyzer test even if she were performing in the top one-percent of all employees. Based upon this record, an employee's status as an alcoholic is the lone trigger for requirements of total abstinence and random testing without cause. And although the use of alcohol alone would not be grounds for terminating the employment of other employees, alcoholics like A.D.P. could be fired for one "slip" even if their job performance was not affected. ExxonMobil's Policy is therefore facially discriminatory. *Cf. Int'l Union v. Johnson Controls, Inc.,* 499 *U.S.* 187, 197–98, 111 *S.Ct.* 1196, 1202–03, 113 *L.Ed.*2d 158, 172–73 (1991).

In light of this direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework, which only shifts a burden of *production* to defendant, is inapplicable. Instead, the *Price Waterhouse* analysis applies and the burden of *persuasion* shifts to ExxonMobil, "to prove that even if it had not considered the proscribed factor, the employment action would have occurred." *McDevitt, supra,* 175 *N.J.* at 527, 816 *A.*2d 164 (citing *Price Waterhouse, supra,* 490 *U.S.* at 244–45, 109 *S.Ct.* at 1787–88, 104 *L.Ed.*2d at 284); *see also Jansen, supra,* 110 *N.J.* at 381–82, 541 *A.*2d 682. "In short, direct proof of discriminatory animus leaves the employer only an affirmative defense on the question of 'but for' cause or cause in fact." *Fleming, supra,* 164 *N.J.* at 100, 751 *A.*2d 1035 (internal citation and quotation marks omitted). The proof required is "evidence sufficient to show that it would have made the same decision *if illegal bias had played no role* in the employment decision." *Ibid.* (emphasis added) (internal citation and quotation marks omitted).

To prevail on its summary judgment motion, ExxonMobil had to show that its Policy and actions were justified as a matter of law under either of the statutory provisions that protect employers' prerogatives to manage their businesses as they see fit.

*Viscik v. Fowler Equip. Co., Inc.*, 173 *N.J.* 1, 13, 800 *A.*2d 826 (2002). Under *N.J.S.A.* 10:5–2.1, an employer retains the right to

terminat[e] or change ... the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment, [and to] discriminat[e] among individuals on the basis of competence, performance, conduct or any other reasonable standards[.]

And, specific to the disability discrimination case, the employer may discriminate against an employee with a disability if "the nature and extent of the disability reasonably precludes the performance of the particular employment." *N.J.S.A.* 10:5–4.1. The Supreme Court observed:

There are, to be sure, situations in which the handicap may affect the alcoholic's ability to do his or her job. The Law does not prohibit discrimination against the handicapped where "the nature and extent of the handicap reasonably precludes the performance of the particular employment." *N.J.S.A.* 10:5–4.1; *see also N.J.S.A.* 10:5–2.1.... In this case, however, [the employer] does not contend that any handicap allegedly suffered by Clowes impeded his job performance. To the contrary, respondent's witnesses consistently denied any knowledge of Clowes's drinking prior to his discharge. [M]any alcoholics are able to function normally in their work, and their co-workers are often unaware of the drinking problem. [*Clowes, supra,* 109 *N.J.* at 594–95, 538 *A.*2d 794 (internal citations and quotations omitted).]

Thus, if the record showed that A.D.P. was unable to adequately perform the duties of her employment, ExxonMobil had the right to terminate or change the conditions of her employment. However, ExxonMobil does not attempt to support its actions by arguing that she failed to perform her job. In essence, ExxonMobil has chosen not to defend its actions under a *Price Waterhouse* analysis by proving it would have subjected plaintiff to random testing and terminated her employment for consuming alcohol even if she were not an alcoholic. Rather, ExxonMobil justifies its actions based only upon the "reasonableness" of its Policy.

 Even if well-intentioned and rational, the reasonableness of a policy must be measured within the context of the specific employee's job performance. When an employee's job performance has not been adversely affected by the disability,

the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. Whether an employment

practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination.

[*Johnson Controls, supra,* 499 *U.S.* at 199, 111 *S.Ct.* at 1203–04, 113 *L.Ed.*2d, at 173–74.]

Notwithstanding its benign purpose, ExxonMobil's Policy plainly imposed additional conditions upon plaintiff's employment that were not imposed upon other employees who were not alcoholics. Therefore, ExxonMobil assumed the burden to prove its affirmative defense, establishing that its facially discriminatory actions were permitted by the statutory exceptions.

Granting plaintiff all legitimate inferences, the record supports the conclusion that plaintiff's job performance played no role in either the imposition of the conditions in the after-care contract or in her termination. Therefore, summary judgment could not be granted to ExxonMobil on the grounds that its action was justified by either *N.J.S.A.* 10:5–4.1 or the performance aspect of *N.J.S.A.* 10:5–2.1. Further, while the standard applicable to all employees— that one may not be "unfit for work because of use of drugs or alcohol"—is a reasonable one, *see, e.g., Barbera v. DiMartino,* 305 *N.J.Super.* 617, 702 *A.*2d 1370 (App.Div.1997) (holding that an employer used a reasonable standard of conduct in declining to rehire an employee who assaulted a fellow employee), *certif. denied,* 153 *N.J.* 213, 708 *A.*2d 64 (1998), that is not the standard that was applied to plaintiff. Indeed, ExxonMobil has not argued that A.D.P. was ever "unfit for work" because of alcohol use.

ExxonMobil argues that it was entitled to summary judgment under either a *McDonnell Douglas* analysis or a direct evidence *Price Waterhouse* analysis because either permits it to justify its actions by presenting a "legitimate non-discriminatory justification for the Policy and its required After–Care Contract[.]" It argues that its justification was twofold: (1) "it has a legitimate business reason—the health, safety and effective functioning of its employees—to implement such a policy[,]" and (2) the Policy "recognizes that there exists a cure for alcoholism, however, without continuous treatment, there is a high rate of relapse[,]" and therefore, the

Policy constitutes a reasonable accommodation of plaintiff's alcoholism.

In advancing this argument, ExxonMobil fails to acknowledge the burden of persuasion it carries to prove its affirmative defense under the direct evidence analysis that is applicable here. Moreover, neither proffered reason provides a basis for summary judgment on this record.

### A.

ExxonMobil's first justification for the application of its Policy to plaintiff conflates two defenses, the "business necessity" defense[6] and the "safety" defense. Neither supports the award of summary judgment here. The "business necessity" defense available in disparate impact cases is inapplicable to disparate treatment cases such as this, *Johnson Controls, supra,* 499 *U.S.* 187, 197–200, 111 *S.Ct.* at 1202–04, 113 *L.Ed.*2d at 172–74, and ExxonMobil has not proven a "safety" defense as a matter of law.

The "safety" defense to an LAD claim permits an employer to "consider whether the handicapped person can do his or her work without posing a serious threat of injury to the health and safety of himself or herself or other employees." *Jansen, supra,* 110 *N.J.* at 374, 541 *A.*2d 682; *see also Maher, supra,* 125 *N.J.* at 481, 593 *A.*2d 750. Again, defendant carries the burden of proving this affirmative defense.

"When asserting the safety defense, the employer must establish with a *reasonable degree of certainty* that it *reasonably* arrived at the opinion that the employee's handicap presented a

---

[6] The business necessity defense provides an "extremely narrow exception to the general prohibition of discrimination," *In re Juvenile Det. Officer Union Cnty.,* 364 *N.J.Super.* 608, 616, 837 *A.*2d 1101 (App.Div.2003), and in the context of disability discrimination, would permit discrimination only when "the nature and extent of the disability reasonably precludes the performance of the particular employment." *N.J.S.A.* 10:5–4.1.

materially enhanced risk of *substantial harm in the workplace.*" *Jansen, supra,* 110 *N.J.* at 383, 541 *A.*2d 682 (emphasis added). Moreover, the employer must conclude "that the handicap will *probably* cause such an injury." *Id.* at 374, 541 *A.*2d 682 (emphasis added); *see, e.g., Estate of Behringer v. Med. Ctr. at Princeton,* 249 *N.J.Super.* 597, 646, 592 *A.*2d 1251 (Law Div.1991) (In determining whether the surgical privileges of a surgeon with AIDS may legitimately be restricted under the LAD, the test is "whether the continuation of surgical privileges ... poses a 'reasonable probability of substantial harm' to others[.]" (internal citation omitted)). The elements of the defense therefore require evaluations of the reasonableness and certainty of ExxonMobil's conclusions as well as the probability of the injury, all of which are fact questions that do not generally lend themselves to disposition by summary judgment.

The mere fact that an employee has a particular disability will not justify such a conclusion. "The employer may not assume that harm will result, nor may it act on the fears and prejudices of other employees." *Barbera, supra,* 305 *N.J.Super.* at 632 n. 5, 702 *A.*2d 1370; *see Jansen, supra,* 110 *N.J.* at 374, 541 *A.*2d 682 ("The mere fact that the applicant is an epileptic will not suffice. Otherwise, unfounded fears or prejudice about epilepsy could bar epileptics from the work force.").

Defendant's Policy contains the general observation "that alcohol, drug, or other substance abuse by employees will impair their ability to perform properly[.]" From this observation, ExxonMobil makes the assumption that such abuse "will have serious adverse effects on the safety, efficiency and productivity of other employees and the Corporation as a whole." The Policy draws no distinction between alcohol abuse and use and fails to justify a conclusion that any alcohol use by plaintiff would pose such a safety risk.

The "safety" defense requires the employer to "make 'an individualized assessment of the safety risk,' which must include objective medical evidence as well as 'relevant records

such as the employee's work and medical histories.' " *Barbera, supra,* 305 *N.J.Super.* at 632 n. 5, 702 *A.*2d 1370 (quoting *Jansen, supra,* 110 *N.J.* at 379, 541 *A.*2d 682). Such an individualized assessment is similarly required under the Americans with Disabilities Act (ADA), 42 *U.S.C.A.* § 12101 to −12213, to justify random alcohol testing of an employee who has returned to work after a rehabilitation program.

Although the LAD includes "significantly broader" definitions for disability, *see Victor v. State,* 203 *N.J.* 383, 410 n. 11, 4 *A.*3d 126 (2010), than the ADA, the ADA's prohibition of discrimination against "a qualified individual on the basis of disability" in the workplace is similar to the prohibition against disability discrimination in the LAD. *Compare* 42 *U.S.C.A.* § 12112(a) with *N.J.S.A.* 10:5–12(a). And alcoholism may qualify as a disability under either statute. *See, Sullivan v. Neiman Marcus Grp., Inc.,* 358 *F.*3d 110, 114 (1st Cir.2004); *Clowes, supra,* 109 *N.J.* at 594, 538 *A.*2d 794.

As further assistance in interpreting the LAD, we look to the interpretation and application of the ADA. *Bosshard v. Hackensack Univ. Med. Ctr.,* 345 *N.J.Super.* 78, 88, 783 *A.*2d 731 (App. Div.2001). Thus, in considering ExxonMobil's requirement that A.D.P. submit to random testing for a minimum of two years, the guidance provided by the United States Equal Employment Opportunity Commission (EEOC) in disability-related inquiries is helpful. The EEOC addressed the very question raised here, "May an employer subject an employee, who has been off from work in an alcohol rehabilitation program, to periodic alcohol testing when s/he returns to work?" [7] In the absence of a "last chance" agreement, the answer was qualified:

> Yes, but only if the employer has a reasonable belief, based on objective evidence, that the employee will pose a direct threat in the absence of periodic testing. Such

---

[7] Sections 12112(d)(1) and (4) of the ADA generally prohibit employers from requiring medical examinations and inquiries of disabled employees "as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."

a reasonable belief requires an individualized assessment of the employee and his/her position and cannot be based on general assumptions . . . .

[EEOC, No. 915–002, *Enforcement Guidance: Disability–Related Inquiries and Medical Examination of Employees under the Americans with Disabilities Act (ADA)*, (2000), available at http://www.eeoc.gov/policy/docs/guidanceinquiries.html (internal citation omitted).]

The EEOC identified factors an employer should consider in determining whether to subject an employee to periodic alcohol testing, such as

the safety risks associated with the position the employee holds, the consequences of the employee's inability or impaired ability to perform his/her job functions, and how recently the event(s) occurred that cause the employer to believe that the employee will pose a direct threat (*e.g.*, how long the individual has been an employee, when s/he completed rehabilitation, whether s/he previously has relapsed).

[*Ibid.*]

In addition, "the duration and frequency of the testing must be designed to address particular safety concerns[.]" *Ibid.* So, when an employee "repeatedly has tested negative for alcohol, continued testing may not be job-related and consistent with business necessity because the employer no longer may have a *reasonable* belief that the employee will pose a direct threat." *Ibid.*

There is no evidence in the record that an individualized assessment of any kind was conducted here. To the contrary, ExxonMobil defends its actions as requirements it uniformly imposed as a matter of policy upon any identified alcoholic. The Policy mandates random testing for a minimum of two years and monitoring for an additional three years without regard to any circumstances unique to the employee. Reliance upon such blanket requirements merely confirms the facially discriminatory nature of the Policy rather than establishing any affirmative defense to the allegation of unlawful discrimination. *See Jansen, supra,* 110 *N.J.* at 378, 541 *A.*2d 682 ("The essence of discrimination . . . is the formulation of opinions about others not on their individual merits, but on their membership in a class with assumed characteristics.").

There are, then, serious deficiencies in the proofs ExxonMobil presents to support a "safety" defense. Defendant has not identified any *substantial injury* to plaintiff or others *in the workplace*

or presented any evidence that such injury would *probably* be caused by her alcoholism in the absence of its actions. Most notably, there was no individualized assessment of the risk posed by plaintiff to justify a Policy-driven period of random testing or termination based upon one incident of alcohol use. The state of the evidence therefore precludes a conclusion that ExxonMobil established a "safety" defense as a matter of law, justifying summary judgment.

## B.

The second justification advanced by defendant is that the Policy constitutes a "reasonable accommodation" because it "recognizes that there exists a cure for alcoholism, however, without continuous treatment, there is a high rate of relapse." In support of this statement, ExxonMobil cites its own Policy and a website from Carrier Clinic. The former is self-serving. The website does not contain such a statement[8] and, in any case, defendant has provided no evidence that it relied upon this source to formulate the Policy.

Defendant's characterization of its Policy as a "reasonable accommodation" also fails. The Supreme Court has instructed that there are only two instances in which reasonable accommodation is an issue:

> The first is the case in which a plaintiff affirmatively pleads failure to reasonably accommodate as a separate cause of action. The second is the case in which an employer, rather than defending on the grounds that the employee was terminated for legitimate, nondiscriminatory reasons, proffers the employee's inability to perform the job as a defense.

---

[8] The website contradicts defendant's statement that there is a cure for alcoholism, describing it as "a chronic, but treatable, brain disorder." *Substance Abuse & Addiction Treatment Services*, Carrier Clinic, www.carrierclinic.org/programs-addiction.php (last visited Sept. 25, 2012); *see also Alcohol Dependence*, Nat'l Inst. on Alcohol Abuse and Alcoholism, www.niaaa.nih.gov/alcohol-dependence (last visited Sept. 25, 2012) (also describing alcohol as a treatable, but chronic, disease).

[*Viscik, supra,* 173 *N.J.* at 19–20, 800 *A.2d* 826 (citations omitted); *see also Soules v. Mount Holiness Mem'l Park,* 354 *N.J.Super.* 569, 571, 808 *A.2d* 863 (App.Div. 2002); *Svarnas v. AT & T Commc'ns,* 326 *N.J.Super.* 59, 74–75, 740 *A.2d* 662 (App.Div.1999).]

Plaintiff did not allege a cause of action based upon a failure to accommodate her disability. And, as noted, defendant has conceded both plaintiff's ability to do her job and that her job performance played no role in her termination. Therefore, reasonable accommodation was not an issue in this case.

 However, even if we disregarded the Supreme Court's guidance, the facts here do not support a characterization of defendant's actions as a reasonable accommodation. The goal of a reasonable accommodation is to allow "a disabled employee to perform the essential functions of his job." *Tynan v. Vicinage 13 of the Sup.Ct. of N.J.,* 351 *N.J.Super.* 385, 397, 798 *A.2d* 648 (App.Div.2002) (internal citation and quotation marks omitted). The employer's duty to accommodate extends no further than that, and, if an employer reasonably determines that an employee "cannot presently perform the job even with an accommodation, then the employer need not attempt reasonable accommodation." *Ibid.* The examples of reasonable accommodation provided in *N.J.A.C.* 13:13–2.5(b) [9] similarly reflect a goal to "eliminate barriers in the work environment[.]" *LaResca v. AT & T,* 161 *F.Supp.*2d 323, 334 (D.N.J.2001) (internal citation and quotation marks omitted).

 The reasonable accommodation process begins with a request by the employee for an accommodation that will allow him or her to perform the essential functions of the job. The employer

---

[9] The regulation provides the following examples of reasonable accommodation:
 i. Making facilities used by employees readily accessible and usable by people with disabilities;
 ii. Job restructuring, part-time or modified work schedules or leaves of absence;
 iii. Acquisition or modification of equipment or devices; and
 iv. Job reassignment and other similar actions.

is then prompted to "initiate an informal interactive process with the employee" in which each has a duty to act in good faith. *Tynan, supra,* 351 *N.J.Super.* at 400, 798 *A.*2d 648.

Plaintiff's request for leave to attend an in-patient rehabilitation program may fairly be considered a request for an accommodation. However, the reasonable accommodation process ended here when ExxonMobil allowed her to obtain those services. Plaintiff made no additional requests for accommodations to enable her to perform the essential functions of her job. There was no interactive process. Defendant dictated the purported accommodation, the terms of the after-care contract, and required plaintiff to agree to its terms if she wanted to keep her job. There is no evidence that the after-care contract's requirements were devised to eliminate barriers to plaintiff's ability to do her job.

In sum, the issue of reasonable accommodation is not present here by virtue of either plaintiff's claims or ExxonMobil's defenses. The actions defendant seeks to justify were imposed without an interactive process. Since plaintiff's job performance was not a factor in these actions, the requirements imposed on plaintiff were not for the purpose of eliminating barriers or allowing plaintiff to perform essential functions of her job that might have been more difficult because of her disability. In short, it is a misnomer to call the conditions imposed upon plaintiff a reasonable accommodation. ExxonMobil was not entitled to summary judgment on this ground.

## II

Plaintiff also argues that the trial judge erred in dismissing her claim that she was wrongfully terminated in violation of public policy, *see Pierce, supra,* 84 *N.J.* at 72, 417 *A.*2d 505. This argument lacks sufficient merit to warrant discussion in a written opinion, *R.* 2:11–3(e)(1)(E), beyond the following brief comments.

Citing *Hennessey v. Coastal Eagle Point Oil Co.,* 129 *N.J.* 81, 95, 609 *A.*2d 11 (1992), she argues that her termination for

failing to comply with the after-care contract constituted a violation of the right to privacy guaranteed by the New Jersey Constitution. *N.J. Const.* art. I, ¶ 2. However, the very authority relied upon by plaintiff notes, "[m]ore is needed than simply the breach of public policy affecting a single person's rights to constitute the breach of a 'clear mandate' of public policy that *Pierce* requires.... A 'clear mandate of public policy' must be one that on balance is beneficial to the public." *Hennessey, supra,* 129 *N.J.* at 99–100, 609 *A.*2d 11 (internal citations omitted). Moreover, plaintiff seeks the same relief under this claim as under her LAD claim. Because plaintiff's claim does not "seek to vindicate interests independent of those protected by the LAD[,]" it is barred. *Bosshard, supra,* 345 *N.J.Super.* at 90, 783 *A.*2d 731; *Catalane v. Gilian Instrument Corp.,* 271 *N.J.Super.* 476, 492, 638 *A.*2d 1341 (App.Div.), *certif. denied,* 136 *N.J.* 298, 642 *A.*2d 1006 (1994).

In summary, we conclude that the trial court erred by granting summary judgment in favor of ExxonMobil on the disability claim. We are convinced that, viewing the evidence in the light most favorable to plaintiff, plaintiff presented direct evidence of unlawful discrimination on the basis of her disability and ExxonMobil did not present sufficient evidence to establish as a matter of law that the disputed Policy and actions were justified under either *N.J.S.A.* 10:5–2.1 or *N.J.S.A.* 10:5–4.1. We are additionally convinced that ExxonMobil did not establish as a matter of law either an affirmative defense or that its Policy represented a reasonable accommodation for plaintiff's disability.

We emphasize that our decision that ExxonMobil was not entitled to summary judgment is based on the evidentiary record and arguments that ExxonMobil presented here and in the trial court. As we noted previously, ExxonMobil has presented evidence which it contends indicates that plaintiff's job performance was adversely affected by her use of alcohol. Plaintiff has disputed that evidence and, as we pointed out, Katherine Ramos testified

that plaintiff was terminated because of the results of the breathalyzer test, not for performance reasons.

We express no opinion as to whether the evidence of plaintiff's job performance or the evidence that her job performance was adversely affected by her use of alcohol was sufficient to provide a legitimate, alternative basis for her termination. We hold only that, viewing the evidence before the trial court on the summary judgment motions in a light most favorable to plaintiff, this factual issue could not be resolved as a matter of law in ExxonMobil's favor.

The order granting summary judgment is affirmed as to the dismissal of the *Pierce* wrongful termination claim, reversed as to the LAD claim, and remanded for further proceedings in conformity with this opinion. We do not retain jurisdiction.