**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4983-18T1

ALI ALALWAN,

    Plaintiff-Appellant,

v.

RUTGERS SCHOOL OF
DENTAL MEDICINE,[1]
DR. ROBERT J. FLINTON
AND DR. LOUIS DIPEDE,

    Defendants-Respondents.

_____

Argued September 23, 2020 – Decided October 20, 2020

Before Judges Fuentes, Whipple and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-4492-16.

Robert P. Merenich argued the cause for appellant (Gemmel Todd & Merenich, PA, attorneys; Robert P. Merenich, on the briefs).

---

[1] Improperly pled as University of Medicine and Dentistry of New Jersey, Rutgers Dental School.

Sean R. Kelly argued the cause for respondents (Saiber LLC, attorneys; Sean R. Kelly of counsel and on the brief; Monvan Hu on the brief).

PER CURIAM

Plaintiff Ali Alalwan appeals from a Law Division order granting defendants Rutgers School of Dental Medicine (RSDM), Dr. Robert J. Flinton, and Dr. Louis DiPede summary judgment and dismissing plaintiff's complaint with prejudice. A Saudi Arabian national and Shiite Muslim, plaintiff is a former student of RSDM's post-graduate prosthodontics program. In his two-count complaint, plaintiff alleged defendants created a hostile educational environment and dismissed him from the program based on his "ancestry, creed, and national origin," thereby violating the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. Plaintiff also asserted breach of contract claims against RSDM, including allegations that the school failed to: (1) properly educate plaintiff and deliberately impeded his progress; (2) adhere to its handbook's procedure for academic dismissals; and (3) provide plaintiff with his complete file in advance of his dismissal hearing. Because we conclude, as did the motion judge, that defendants must prevail as a matter of law, we affirm.

## I.

We review the trial court's grant of summary judgment de novo. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). Employing the same standard the trial court uses, we review the record to determine whether there are material factual disputes and, if not, whether the undisputed facts viewed in the light most favorable to plaintiff nonetheless entitle defendant to judgment as a matter of law. Ibid.; Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); see also R. 4:46-2(c). We owe no deference to the trial court's legal analysis or interpretation of a statute. Palisades at Fort Lee Condo. Ass'n v. 100 Old Palisade, LLC, 230 N.J. 427, 442 (2017) (citation omitted).

Viewed in the light most favorable to plaintiff, the pertinent facts are as follows. Plaintiff began RSDM's three-year program in July 2013. The program included classroom learning and supervised clinical training. Plaintiff was one of five students enrolled in the program; four students were citizens of Saudi Arabia, whose government funded their tuition. Dr. DiPede served as the program's director; Dr. Flinton was a member of the faculty.

Plaintiff's academic and clinical performance began proficiently, but rapidly declined. By the end of the first semester in January 2014, plaintiff

A-4983-18T1

received several poor faculty evaluations for his clinical performance, including failing grades from one instructor and below-average grades from Dr. Flinton. One faculty member commented: "As we discussed, we all have major problems with [plaintiff]. He has little to no grasp of prosthodontics [and] has done almost no patient treatment. He has presented to clinic with an unprofessional appearance." Dr. Flinton also remarked plaintiff had "accomplished virtually nothing" in terms of clinical practice.

As the program's director, Dr. DiPede prepared plaintiff's summary evaluation in January 2014, which included seven "C" and two "B" grades. Initially noting plaintiff "is a very intelligent, personable young man and . . . very respectful[,]" Dr. DiPede then commented:

> [Plaintiff] has accomplished very little clinically. After review, many of his patients are awaiting consults or treatment in other departments. Even so, [plaintiff] needs to make his needs for clinical productivity known and not ignore the issue. Clinical accomplishments are a requirement of the program. I have assigned him "ready[-]to[-]go cases"[2] and will meet with him formally on a monthly basis until the year's end semi-annual evaluation. I believe he does have the capability and ability to turn things around and I certainly hope

---

[2]  In their responding brief, defendants described "ready[-]to[-]go" cases as "cases that would allow [plaintiff] to treat patients immediately so that he would have the best possible opportunity to improve the quality of his work in a short period of time."

that he does so. I would encourage [plaintiff] to do more independent study and be able to discuss relevant topics in prosthodontics based on that independent study.

During the ensuing months, plaintiff and Dr. DiPede met several times.[3] But, defendant made little clinical progress, failing a mock board examination and three courses during his second semester. Again, several faculty members submitted critical evaluations to Dr. DiPede. One instructor noted plaintiff: "Seems not to be getting any of the concepts. Doesn't listen to what he's being told to do. He is struggling in the program. Seems lost even after a year." Another member renewed his criticism of plaintiff's clinical performance:

There is a continuing problem [with plaintiff]'s work habits. I have helped him [with] numerous treatment plans but then there seems to be little or no follow-up in implementing or starting actual treatment. He's often not in clinic. I think all faculty need to discuss his continuation in the [p]rogram.

Referencing his previous evaluation, Dr. DiPede's July 2014 summary evaluation noted plaintiff "is on academic probation" and has been assigned "ready[-]to[-]go" cases, but plaintiff failed to undertake independent study.

---

[3] When deposed and in his answers to defendants' material statement of facts in support of their summary judgment motion, plaintiff denied he and Dr. DiPede discussed plaintiff's academic performance, claiming they only spoke about "patient flow."

Citing plaintiff's "lack of understanding of basic prosthodontic principles and lack of confidence treating patients[,]" Dr. DiPede "c[ould] not fathom a reason for a resident entering their [sic] second year, to be so far below the level of didactic knowledge expected."

In addition, two mock board examiners issued plaintiff failing grades; a third evaluator did not complete a written evaluation because plaintiff was unprepared. It is undisputed that plaintiff did not submit a completed clinical case to the examiners.

Notwithstanding plaintiff's poor performance, RSDM permitted plaintiff to retake the mock board examination in August 2014. Plaintiff again failed to present a completed clinical case and, as such, the format was changed to a general oral examination. Drs. DiPede and Flinton administered the exam, which plaintiff failed in all evaluative categories. Dr. DiPede noted plaintiff's knowledge was "shockingly poor"; Dr. Flinton remarked plaintiff was a "danger to his patients" and should be dismissed from the program "ASAP." No other students had twice failed RSDM's mock board examination.

During the same timeframe, plaintiff also made errors while treating two patients in the clinic, spilling hot wax on one patient's lip and improperly installing a dental apparatus on another. Given plaintiff's academic and clinical

failures and his errors in treating two patients, RSDM suspended plaintiff's clinical privileges on September 8, 2014, citing its "concern for patient safety."

Three weeks later, RSDM's Postdoctoral Education Committee convened to consider plaintiff's dismissal from the program, affording plaintiff an opportunity to explain "any extenuating circumstances that may have contributed to [his] poor academic performance and answer any questions the committee may pose." Plaintiff addressed his three failing grades in his clinical prosthodontics course, literature review seminar, and implant core course.

Plaintiff "admit[ted] that [his] performance in the clinic ha[d] declined." But he "attribute[d] this decline to the personal attacks made by Dr. Flinton, who [wa]s not [his] supervisor in the clinic." Plaintiff told the Committee "Dr. Flinton's behavior of criticizing [plaintiff's] performance in front of patients and residents accelerated after May [2014], to the point where [plaintiff] was having a hard time concentrating in the clinic for fear of [Dr. Flinton's] constant criticism." Plaintiff did not understand how Dr. DiPede twice complimented his work in the clinic, while Dr. Flinton said plaintiff's work was "terrible." Plaintiff claimed he attempted to "make peace with Dr. Flinton," but his attempts were rebuked. Dr. Flinton told plaintiff "I have lost faith in you. You don't deserve the position. I think you should just go home. I don't believe in you." Plaintiff

also claimed Dr. Flinton "hit [him] in the chest in front of other residents" and "pointed his middle finger at [plaintiff]." For the first time, plaintiff reported: "Dr. Flinton has told me, 'I hate Arabs.'"[4]

Plaintiff attributed his failing grades in the literature review seminar – which primarily consisted of the mock board examination – to the nervousness he felt around Dr. Flinton. Plaintiff claimed during his second mock board examination, Dr. Flinton "glared at [plaintiff], even before [he] opened [his] mouth." And, "Dr. Flinton's constant criticism" made plaintiff "so nervous" he could not concentrate on the implant core final examination. Plaintiff also told the Committee RSDM had failed to issue a "verbal or written warning that [plaintiff] was at risk of academic action[,]" thereby violating the protocols for corrective measures outlined in its student handbook. The Committee recommended plaintiff's dismissal; plaintiff filed an administrative appeal.

Thereafter, plaintiff met with RSDM's dean, who offered plaintiff reinstatement to the program, conditioned upon his completion of basic

---

[4] The statement was allegedly made during a private conversation between Dr. Flinton and plaintiff in July or August of 2014. Plaintiff asserted in his answers to interrogatories and counterstatement of material facts, supporting defendant's motion that the statement was made in August 2014; plaintiff testified at his deposition it was uttered in July 2014.

competency examinations and repetition of his first academic year. Plaintiff refused the dean's offer and filed his complaint in the Law Division.

Following the close of discovery, defendants moved for summary judgment. In a cogent written decision accompanying a June 3, 2019 order, the motion judge granted defendants' motion. This appeal followed.

II.

A. Plaintiff's LAD Claims

Pertinent to this appeal, the motion judge determined plaintiff – having conceded RSDM did not treat him differently from non-Arabs – failed to demonstrate a prima facie violation of the LAD, and Dr. Flinton's remark was not severe enough to establish a hostile educational environment. The judge noted plaintiff's poor performance occurred months before Dr. Flinton made the alleged statement and, because Dr. Flinton was "only one of several evaluators," he was not the decisionmaker who terminated plaintiff from the program.

On appeal, plaintiff maintains he established "a prima facie direct evidence Price Waterhouse[5] discrimination case on the basis of his Saudi national origin" regarding his claims of wrongful dismissal and hostile

---

[5] Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).

educational environment. Because no New Jersey case has addressed a discriminatory discharge claim by a student against a public university under the LAD, we begin our analysis by recognizing the act's well-established principles.

Initially, the LAD provides, in pertinent part:

> All persons shall have the opportunity to obtain . . . all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of . . . national origin . . . subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.
>
> [N.J.S.A. 10:5-4.]

Further, the LAD prohibits "any owner, . . . manager, . . . agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny . . . any person any of the accommodations, advantages, facilities or privileges thereof, . . . on account of . . . [the person's] national origin . . . ." N.J.S.A. 10:5-12f(1).

N.J.S.A. 10:5-12 explicitly proscribes discrimination in the employment context, but its protections have been extended to non-employment situations, including schools and educational settings. See L.W. v. Toms River Reg'l Schs. Bd. of Educ., 189 N.J. 381, 402 (2007) (applying LAD's prohibition against sexual harassment in a public school setting). As the Court recognized in L.W.,

"our courts counsel that 'the more broadly [the LAD] is applied the greater its antidiscriminatory impact.'" Id. at 400. (quoting Ptaszynski v. Uwaneme, 371 N.J. Super. 333, 345 (App. Div. 2004) (alteration in original)). Moreover, public universities and colleges are expressly included in the LAD's definition of "[a] place of public accommodation." N.J.S.A. 10:5-5(l); see also Frank v. Ivy Club, 120 N.J. 73, 111 (1990) (divining the Legislature's intent "to eliminate discrimination in educational institutions" by its designation of colleges and universities among the definitions of N.J.S.A. 10:5-5(l)). Accordingly, we consider employment cases for guidance in addressing the issues raised on appeal.

It is well settled that a plaintiff may establish a prima facie case of discrimination through direct or circumstantial evidence. Smith v. Millville Rescue Squad, 225 N.J. 373, 394 (2016); see also A.D.P. v. ExxonMobil Rsch. and Eng'g Co., 428 N.J. Super. 518, 531 (App. Div. 2012). Our Supreme Court has noted: "A case established through direct evidence is also referred to as either a 'Price Waterhouse case' or a 'mixed-motive case,' and a case established through circumstantial evidence may be referred to as a 'McDonnell Douglas case' or a 'pretext case.'" Millville Rescue Squad, 225 N.J. at 394 n.3.

11

To establish a claim by direct evidence, "[t]he evidence produced must, if true, demonstrate not only a hostility toward members of the [plaintiff]'s class, but also a direct causal connection between that hostility and the challenged employment decision." Bergen Commer. Bank v. Sisler, 157 N.J. 188, 208 (1999) (citing Price Waterhouse, 490 U.S. at 277 (O'Connor, J., concurring)). That statement must be made by a decisionmaker; actually bear on the employment decision at issue; and communicate "proscribed animus." McDevitt v. Bill Good Builders, Inc., 175 N.J. 519, 528 (2003). A plaintiff must demonstrate its employer placed "substantial reliance on a proscribed discriminatory factor in making its decision to take the adverse employment action." Id. at 527. "Such proof is established by evidence 'of conduct or statements by persons involved in the decision[-]making process that may be viewed as directly reflecting the alleged discriminatory attitude.'" A.D.P., 428 N.J. Super. at 534 (quoting Fleming v. Corr. Healthcare Sols., Inc., 164 N.J. 90, 101 (2000)). If a plaintiff establishes discriminatory animus by direct evidence, the burden of persuasion shifts to the defendant to "produce evidence sufficient to show that it would have made the same decision if illegal bias had played no role in the employment decision." Fleming, 164 N.J. at 100 (internal quotation marks omitted) (citation omitted).

A-4983-18T1

Proof of discrimination through direct evidence is unusual.  See Bergen Commer. Bank, 157 N.J. at 209-10.  Accordingly, the United States Supreme Court has formulated the so-called McDonnell Douglas test, whereby a plaintiff may establish through circumstantial evidence, a prima facie case of discrimination, or a "presumption of discrimination." Id. at 210-11.  Of course, if a plaintiff proves discrimination by direct evidence, "the McDonnell Douglas analysis does not apply." A.D.P., 428 N.J. Super. at 533.

Under the McDonnell Douglas test, a plaintiff must satisfy the four-pronged test that our courts have modified to suit certain forms of discrimination in particular settings.  Victor v. State, 203 N.J. 383, 408-10 (2010).  In an employment discriminatory discharge case, the aggrieved employee must demonstrate he or she: (1) "is in a protected class"; (2) "was otherwise qualified and performing the essential functions of the job"; (3) "was terminated"; and (4) "the employer thereafter sought similarly qualified individuals for that job." Id. at 409.  If the plaintiff satisfies that four-pronged test, creating a presumption of discrimination, then "[t]he defendant . . . bears the burden of rebutting that presumption by articulating a legitimate and non-discriminatory reason for the termination." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 458 (2005).  The burden of persuasion, however, remains with the plaintiff.  Once the defendant

13

rebuts the presumption of discrimination, the plaintiff must "not simply show that the employer's reason was false" or pretextual, "but must also demonstrate that the employer was motivated by discriminatory intent." Id. at 449.

"The key difference between a direct-evidence case and a circumstantial-evidence case is 'the kind of proof the [plaintiff] produces on the issue of bias.'" Millville Rescue Squad, 225 N.J. at 396 (quoting Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1097 (3d Cir. 1995)). As we observed in A.D.P.,

> stray remarks unrelated to the decisional process, such as an employer's comment that "everyone over 35 should be sacked" and references to older employees as "little old ladies" and "old cows," have been characterized as circumstantial evidence, while "a scrap of paper saying, 'Fire Rollins — she is too old'" was an example of direct evidence. . . . The emphasis is upon the quality of proofs, rather than their nature as direct or circumstantial evidence.
>
> [428 N.J. Super. at 534 (citations omitted).]

Against that legal backdrop, we turn to plaintiff's LAD claims. As he did before the motion judge, plaintiff contends Dr. Flinton's allegedly discriminatory statement constituted "direct evidence" of defendants' unlawful discrimination under the LAD. Plaintiff principally argues the motion judge failed to consider "direct evidence of [Dr. Flinton]'s discriminatory animus" and that plaintiff "was improperly dismissed at the hands of persons who

manufactured a record" to support his dismissal. Plaintiff further argues his three failing grades were pretextual. Finally, plaintiff asserts the motion judge erroneously concluded Dr. Flinton was not a decisionmaker.

Although the motion judge did not expressly address the distinction between direct- and circumstantial-evidence discrimination cases under the LAD, the judge rejected plaintiff's wrongful dismissal claim under the less-stringent McDonnell Douglas, circumstantial evidence framework. On appeal – as he did before the motion judge – plaintiff appears to conflate these evidentiary theories, arguing he proffered direct evidence of a prima facie showing of discrimination under the LAD although his claims are based largely on circumstantial evidence. Having considered the record, we find no merit to plaintiff's contentions under either theory.[6]

---

[6] We recognize an argument not raised on appeal is deemed waived, Zaman v. Felton, 219 N.J. 199, 226-27 (2014). Because the motion judge decided plaintiff's claims under circumstantial-evidence standards, and plaintiff relies on circumstantial evidence of discrimination in his merits brief, we consider plaintiff's arguments and affirm the order under review for reasons in addition to those articulated by the judge in his written opinion. Accord Brooks v. April, 294 N.J. Super. 90, 92 (App. Div. 1996) (affirming the summary judgment orders for reasons other than those expressed by the trial court).

## 1. Discriminatory Dismissal Allegation

We briefly address plaintiff's discriminatory dismissal claims under a direct-evidence theory. As a threshold matter, Dr. Flinton was not a member of the Committee or the RSDM's dean and, as such, he was not the primary decisionmaker, who ultimately dismissed plaintiff from the program. However, Dr. Flinton arguably had at least some input in the decision-making process, on whose evaluations the Committee and dean relied. See Grasso v. West New York Bd. Of Educ., 364 N.J. Super. 109, 118 (App. Div. 2003) (observing "discriminatory comments made by one with input into the decision-making process are not stray remarks"). Contrary to plaintiff's assertion, the motion judge did not conclude otherwise.[7]

Nonetheless, plaintiff failed to show a "direct" causal connection between Dr. Flinton's alleged statement and plaintiff's dismissal from the program. See Millville Rescue Squad, 225 N.J. at 394. Dr. Flinton's statement was allegedly

---

[7] In his evaluation of plaintiff's hostile environmental discrimination claim, the motion judge determined "Dr. Flinton was only one of several evaluators who graded [p]laintiff as performing poorly in the [p]rogram. Plaintiff's success in the [p]rogram was not solely dependent on Dr. Finton's evaluation, but rather [on] a multitude of factors." As stated above the motion judge did not evaluate plaintiff's claim pursuant to a direct evidence theory of discrimination. Accordingly, the judge did not expressly determine Dr. Flinton had no input in the decision-making process.

made during a private conversation with plaintiff, months before plaintiff was dismissed from the program, after plaintiff had received poor grades from several other faculty evaluators and failed his first mock board exam administered by other faculty members.

Further, the Commission's dismissal recommendation was "based on [plaintiff's] academic performance of an 'F' grade in Clinical Prosthodontics, an 'F' grade in Literature Review Seminar, and an 'F' grade in Implant Core course." Nor has plaintiff proffered any evidence that Dr. Flinton's statement "actually bore" on the dean's decision to offer plaintiff conditional reinstatement to the program. See Millville Rescue Squad, 225 N.J. at 395. We therefore conclude plaintiff failed to establish a "direct" causal connection between Dr. Flinton's alleged discriminatory statement and plaintiff's discharge from the program. See A.D.P., 428 N.J. Super. at 534.

And as the motion judge recognized, plaintiff conceded at oral argument he was not treated differently from non-Arab students. In fact, the majority of students in the program were Saudi Arabian, and no other student had failed the mock board examination twice as did plaintiff. See Mandel v. UBS/PaineWebber, Inc., 373 N.J. Super. 55, 76 (App. Div. 2004) (upholding summary judgment dismissal of plaintiff's religious discrimination claim where

17

there was no evidence Jewish employees were treated less favorably than non-Jewish employees).

Moreover, the statement, "I hate Arabs," allegedly made by Dr. Flinton months before the Committee voted to dismiss plaintiff from the program, is not inherently direct evidence of discrimination. See A.D.P., 428 N.J. Super. at 534. Instead, the other remarks allegedly made by Dr. Flinton, which plaintiff claims support his contention that Dr. Flinton "mount[ed] a campaign to remove [him] from the program," constitute circumstantial evidence. Accordingly, as the motion judge implicitly found, the present case is more appropriately analyzed as one entailing indirect evidence of discrimination and, as such, is subject to the McDonnell Douglas burden-shifting construct.

Applying the McDonnell Douglas factors to plaintiff's discrimination claims here – as the motion judge correctly observed – plaintiff was required to demonstrate: (1) he is a member of a protected class; (2) he was otherwise qualified for the academic position; (3) he suffered an adverse educational action; and (4) he was treated differently than similarly-situated students, who were not members of the protected class. See Millville Rescue Squad, 225 N.J. at 395. Having considered those factors, we agree with the judge's determination

18

that plaintiff – through his own concession – failed to establish defendants treated him differently from non-Arabs.[8]

We further observe plaintiff failed to demonstrate he was otherwise qualified for his academic position. Plaintiff failed to remediate the poor grades he received during his first semester or otherwise improve himself, despite Dr. DiPede's efforts to assign plaintiff "ready-to-go" cases and encouragement to avail himself of independent study. Rather, plaintiff's academic and clinical performances further deteriorated, resulting in three additional failing grades and the suspension of clinical privileges after he injured two patients.

### 2. Hostile Educational Environment Allegation

On appeal, plaintiff renews his argument that Dr. Flinton's comment – "I hate Arabs" – in conjunction with Dr. Flinton's criticism of plaintiff's academic and clinical performance created a hostile educational environment. Defendants counter that Dr. Flinton's "alleged conduct was neither 'severe' nor 'pervasive' enough to sustain" a hostile educational environment claim. Defendants contend

---

[8] The motion judge also found plaintiff failed to demonstrate he was treated different from non-Muslims. Although we do not disagree with that determination, on appeal, plaintiff limits his claims to national-origin discrimination.

the alleged remark, even if considered with the other conduct plaintiff alleges, is "insufficient to give rise to a hostile environment claim." We agree.

We derive the standard applicable to this case from the Supreme Court's analysis of discrimination in places of public accommodation in an action against a school district by a student who had alleged discrimination by fellow-students on the basis of perceived sexual orientation. L.W., 189 N.J. 381. In L.W., the Court held the appropriate standard was similar to the standard of liability for hostile work environment sexual harassment it had previously established in Lehmann v. Toys 'R' Us, 132 N.J. 587, 626 (1993). 189 N.J. at 405. In Lehmann, the Court determined an employee states a claim for hostile work environment when the employee alleges "severe or pervasive" discriminatory conduct that "create[s] an intimidating, hostile, or offensive working environment." 132 N.J. at 592. In later cases, the Court recognized a single offensive comment can be enough to meet the Lehmann standard. See Taylor v. Metzger, 152 N.J. 490, 501-03 (1998) (holding the one-time usage of the racial slur, "jungle bunny," could create a hostile work environment).

We determine the standard adopted by the Court in L.W. and Lehmann is equally applicable in the present context of a hostile educational environment

A-4983-18T1

claim under the LAD. As correctly articulated by the motion judge, that standard requires the plaintiff to

> demonstrate that the defendant's "conduct (1) would not have occurred but for the [student's protected status]; and [the conduct] was (2) severe or pervasive enough to make a (3) reasonable [member of the protected class] believe that (4) the conditions of [education] are altered and the [educational] environment is hostile or abusive."
>
> [Taylor, 152 N.J. at 498 (second alteration in original) (citation omitted).]

In addition to applying those factors here, the motion judge also heeded the Court's admonition that "a single utterance of an epithet can, under particular circumstances, create a hostile work environment" and "[t]he connotation of the epithet itself can materially contribute to the remark's severity." Id. at 501-02. Nonetheless, the judge concluded Dr. Flinton's remark was not "severe or pervasive enough to alter the conditions of [p]laintiff's education and render the educational environment hostile or abuse." Noting the remark allegedly was "made on a single occasion," the judge also determined its substance was "distinct from and not as severe as the racial epithets ordinarily found in hostile environment cases."

In reaching his conclusion, the judge found the timing of the statement was "a crucial factor" where, as here, the alleged remark "occurred in July 2014,

21

near the conclusion of [p]laintiff's 2014 academic semester" while the record evidence "demonstrate[d] that [p]laintiff had been performing poorly in the [p]rogram months prior to" its utterance. We discern no reason to disturb the judge's decision.

## B. Plaintiff's Breach of Contract Claims

The motion judge initially determined plaintiff's breach of contract and breach of the covenant of good faith and fair dealing claims were not preempted by the LAD – as RSDM had argued – because they were based on violations of RSDM's handbook. Citing our decision in Mittra v. University of Medicine and Dentistry of New Jersey, 316 N.J. Super 83, 92 (App. Div. 1998), the judge nonetheless found plaintiff failed to demonstrate RSDM "significantly deviated from its published rules and regulations." Instead, the judge concluded RSDM "took corrective measures in response to [p]laintiff's poor academic performance and substantively complied with its procedure for unsatisfactory academic performance." Because plaintiff failed to file a formal complaint prior to his dismissal hearing, the judge also determined plaintiff did not afford himself of the handbook's "several sources to contact in the event of bias and conflicts with faculty, staff or students."

On appeal, plaintiff argues he established a prima facie breach of contract claim, essentially renewing his contention that RSDM failed to offer plaintiff corrective measures, including a probationary period, pursuant to its handbook. Plaintiff also asserts he set forth a prima facie breach of the covenant of good faith and fair dealing claim, asserting RSDM fabricated his course failures and probationary status and concealed plaintiff's favorable evaluations. We are not persuaded by any of plaintiff's arguments.

Preliminarily, to the extent plaintiff contends RSDM breached the implied covenant of good faith and fair dealing by manufacturing course failures and corrective measures, those pretextual claims are barred by preemption under the LAD. See Catalane v. Gilian Instrument Corp., 271 N.J. Super 476, 491-92 (App. Div. 1994) (recognizing "supplementary common law cause[s] of action [are not permitted] when a statutory remedy under the LAD exists"). Indeed, a pretextual discriminatory discharge claim falls squarely within the interests vindicated by the LAD. See Millville Rescue Squad, 225 N.J. at 396.

Little need be said about plaintiff's remaining breach of contract claims. As the motion judge correctly observed, our courts have long recognized "[r]igid application of contract principles to controversies concerning student academic performance would tend to intrude upon academic freedom and to generate

precisely the kind of disputes that the courts should be hesitant to resolve." Mittra, 316 N.J. Super. at 91. Instead, courts will evaluate whether a student was terminated following a "fair procedure." Hernandez v. Overlook Hosp., 149 N.J. 68, 81 (1997). "Such 'fair procedure' includes the right to adequate notice of deficiencies, an opportunity to examine the evidence of those deficiencies used by the [institution] to make its academic decision, and the right to present a case to the decision-making authority." Ibid. If an institution has in place such procedures, the court "may intervene where the institution violates in some substantial way its rules and regulations pertaining to student dismissals." Mittra, 316 N.J. Super. at 92.

Among other things, RSDM's handbook sets forth the procedure where, as here "a student achieves documented unsatisfactory academic performance." Pertinent to this appeal, that procedure requires the program's director to: (1) "counsel the student"; (2) "outline corrective measures and . . . establish criteria and time frames for the correction of the deficiencies"; (3) "document all interactions with the student in writing"; and (4) "[a]t the end of the stated time frame, . . . reevaluate the student's compliance with corrective actions." If the student's "deficiencies continue to exist beyond the time frames established for effecting corrective measures[,]" the director is required to assess the student's

performance and make recommendations "for further academic action," including dismissal from the program.

Plaintiff's argument that RSDM failed to "provide any probationary period, corrective measures or a time period to correct measures in writing" is belied by the record. In his January 2014 summary evaluation, Dr. DiPede clearly provided a corrective plan to help plaintiff "turn things around." That plan included formal monthly meetings "until the year's end semi-annual evaluation"; "independent study"; and "ready to go cases." Accordingly, we discern no error in the motion judge's decision concluding RSDM complied with the corrective-measure procedures outlined in its handbook. See Mittra, 316 N.J. Super at 92.

To the extent not addressed, defendant's remaining arguments lack sufficient merit to warrant discussion in our written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4983-18T1