783 A.2d 731 (2001)
345 N.J. Super. 78
Denise BOSSHARD, Plaintiff-Appellant,
v.
HACKENSACK UNIVERSITY MEDICAL CENTER, Lisa Oldham and Diane Moslowski, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted October 1, 2001.
Decided November 5, 2001.
*732 Kenneth W. Herbert and Associates, attorneys for appellant (Dwight D. DeStefan and Mr. Herbert, on the brief).
Grotta, Glassman & Hoffman, attorneys for respondents Hackensack University Medical Center and Lisa Oldham (Daniel A. Tabs, of counsel and on the brief).
Before Judges BRAITHWAITE, COBURN and WEISSBARD.
The opinion of the court was delivered by COBURN, J.A.D.
Plaintiff, Diane Bosshard, sued her employer, defendant Hackensack University Medical Center ("HUMC"), and two of her supervisors, defendants Lisa Oldham and Diane Moslowski, after she was discharged from employment. Her primary claims were based on the handicap provisions of the Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 to -42. She alleged that she was unlawfully discharged because of her addiction to heroin, despite her successful completion of a drug rehabilitation program, and because of a hearing impairment, for which no accommodation had been provided. She also asserted that dismissal of a hearing-impaired employee for past addiction to heroin after the employee had successfully completed a drug rehabilitation program violated public policy. Her other claims were: intentional infliction of *733 emotional distress, fraud, and breach of contract. Defendants resisted plaintiff's legal theories as either unsound or unsupported by evidence and maintained that the case involved nothing more than Bosshard's dismissal for altering medical records in violation of hospital policy. The Law Division dismissed some counts of the complaint for failure to state a cause of action and granted summary judgment on the rest. Plaintiff appeals.[1] We affirm.

I
HUMC, a full-service hospital, hired plaintiff as an at-will employee on June 3, 1996, and assigned her to the non-invasive vascular department, where she worked as a vascular technician under Lisa Oldham, the nurse manager, and Diane Moslowski, the technical supervisor. Her duties included performing non-invasive arterial and venous procedures and interpreting and recording the results, which were then reviewed by a physician. Although she worked primarily with a sonogram to take ultrasounds, she also was required to use a stethoscope or a Doppler for two purposes: to distinguish blood pressure sounds and to hear "bruits" (abnormal sounds heard during diagnostic monitoring of parts of the body).
Plaintiff has a long-standing, bilateral hearing disability, which she addresses by wearing hearing aids in both ears. There is no medical evidence that her aided hearing is less than normal; however, in her opinion, even with the hearing aids, she was unable to use the ordinary stethoscope or the Doppler to properly assess blood pressure and hear bruits. Consequently, shortly after her employment began, she asked Moslowski to get her a special stethoscope for the hearing-impaired, although she had never seen such a device. Moslowski reported to her that the purchasing department could not locate the device but added that if plaintiff could find one, HUMC would pay for it. Plaintiff tried to find one without success. Moslowski certified that the Doppler was adequate for both purposes, and plaintiff admitted that she used the Doppler, as instructed, without criticism from her supervisors. Nonetheless, in her opinion the Doppler was inadequate because, she said, it "only reads the systolic, and it reads one-half of a blood pressure reading." She also said she could not hear bruits with the Doppler. And yet, in her ninety-day performance evaluation of August 1996, which rated plaintiff as satisfactory in thirteen areas and unsatisfactory in four, one of plaintiff's satisfactory ratings was for performing "vascular assessment using stethoscope, Doppler ultra sound probe."
On April 18, 1997, plaintiff received a "DISCIPLINARY ACTION NOTICE" for unsafe practices which stated, in part:
Upon review of your current technical practice the following has been noted. You had performed three tests which required correction, these were reviewed with you on April 8, 1997. One of these[,] U# 8866533[,] patient was medically treated inappropriately based on your findings. On April 8th you were offered educational support and declined. You were encouraged to seek assistance [while] performing a test if you so needed. Since this time, U # 4276911, your findings showed a stenosis, but after reviewing your records and tapes, it was determined to repeat the study and an occlusion was found. Also U# 3091923 was seen from the ER on 4/11/97[;] you performed a test on the right leg but neglected to verify the order which specified bilateral testing. This is considered unsafe practice. *734 Immediate and sustai[ned] improvement is necessary. Any further practice issues will result in further discipli[nary] action up to and including termination.
On May 8, 1997, a physician asked plaintiff to correct one of her reports because it erroneously stated that the patient had a catheter. Although plaintiff knew that alteration of a medical record was against HUMC's policy, she responded by using white-out to delete the misinformation. She followed that course because her supervisor was not in and "the use of white-out was allowed in other circumstances." However, she was aware that its use in this instance might not be appropriate. Consequently, she placed the patient's file on Moslowski's desk with a note asking that they discuss the matter the next morning. The next day, Friday, May 9, the file was brought to Oldham. After seeing the white-out and the note written by plaintiff, Oldham brought plaintiff into her office. According to Oldham, plaintiff admitted that she had known that using the white-out was wrong. At Oldham's direction, plaintiff immediately wrote out an explanation of what had occurred in which she stated, among other things:
I discussed the error with Dr. Rho on 5/8/97 and told him I will ask my supervisor to retype this report leaving the catheter out. What I should have done was not "white-out" about the catheter, but mention this to the reading doctor.
Implicit in the balance of the note was plaintiff's contention that she was not sure how to make the necessary correction. According to Oldham, the correct procedure would have been the preparation of an addendum to the report. She advised plaintiff that use of the white-out was a serious offense that required immediate suspension pending further investigation and consultation with her superiors. She sent plaintiff home, explaining that she would "get back to her" when the investigation was completed.
Plaintiff was scheduled to begin a one week vacation on Monday which under ordinary circumstances would have resulted in her returning to work on Monday, May 19. However, on Tuesday, May 13, she called the coordinator of the "Employees Assistance Program ("EAP"), and told her that she was depressed and had used marijuana and heroin over the weekend." Plaintiff's drug usage had been ongoing for some unspecified period of time. The coordinator arranged for plaintiff to be admitted to a New York hospital for an in-house, twenty-eight-day drug treatment program, which began on Wednesday, May 14. Under EAP policy, information respecting the nature or purpose of any hospitalization is not to be given to the employee's supervisor without express, written authorization from the employee.
On or about May 15, Oldham's superiors instructed her to dismiss plaintiff. A "DISCIPLINARY ACTION NOTICE," with the typed "Issue Date" of "5/16/97" was prepared. It provided for discharge of plaintiff on the issue date and listed the cause for discharge as "alteration of a medical record." Oldham tried without success to reach plaintiff by telephone at her home to complete the termination; then decided to terminate her when she returned from her vacation on Monday, May 19. There is no evidence that Oldham, or anyone else at HUMC outside of EAP and the Employee Health Department, knew that plaintiff was receiving drug rehabilitation treatment. When plaintiff did not report to work on May 19, Oldham again attempted to reach her by telephone, this time learning from her mother that plaintiff was in a hospital and that HUMC knew about it. Plaintiff's mother did not state the reason for the *735 hospitalization. Oldham checked with the Employee Health Department, which advised only that plaintiff was hospitalized and would be out of work on temporary disability. Oldham informed her supervisors that the termination would be finalized when plaintiff returned to work at the conclusion of her hospitalization.
On June 12, having completed the drug treatment program, plaintiff called Moslowski and said she was ready to return to work. Moslowski told her to report on Monday, June 16, which she did. When plaintiff arrived, Oldham "asked for her paperwork for returning to work through employee health because she was out on temporary disability." Since plaintiff did not have the necessary paperwork, Oldham instructed her to get it from the Employee Health Department.
At the Employee Health Department, plaintiff underwent a physical examination and blood and urine tests, as required by HUMC's standard procedure for an employee returning from drug rehabilitation treatment. She passed the tests, signed a "Return to Work Agreement," and reported to Oldham, who promptly informed her that she was being terminated for the white-out incident. Oldham also gave her a copy of the May 16, 1997 "DISCIPLINARY ACTION NOTICE," which had been changed in only two respects: the "Issue Date" and the "Discharge, effective date" were changed in handwriting to "6/16/97."

II
The first question is whether addiction to a controlled dangerous substance, such as heroin, may be considered a handicap under the LAD. Plaintiff argues that Clowes v. Terminix Intern., Inc., 109 N.J. 575, 538 A.2d 794 (1988), and In re Cahill, 245 N.J.Super. 397, 585 A.2d 977 (App.Div. 1991), require a simple, affirmative response. We disagree, but we also reject defendants' position that addiction to a controlled dangerous substance can never be a handicap under the LAD simply because their possession and use are criminal offenses under the Comprehensive Drug Reform Act of 1986, L. 1987, c. 106, § 1, N.J.S.A. 2C:35-1 to -24. Rather, we think the more complex and more satisfactory answer is that adopted by the federal government in Section 12114 of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C.A. § 12101 to -12213, which draws a distinction between current use and past use followed by rehabilitation, treating only the latter as a protected disability.
The LAD defines "handicap" in the following manner:
q. "Handicapped" means suffering from physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or from any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. Handicapped shall also mean suffering from AIDS or HIV infection.

[N.J.S.A. 10:5-5(q).]
In Clowes, the issue was whether alcoholism was a handicap under the LAD. The Court began with the proposition that the LAD deserved a liberal construction *736 since it was remedial social legislation. 109 N.J. at 590, 538 A.2d 794. After discussing the nature of alcoholism and its treatment by the medical profession as a disease, the Court observed that apart from a few exceptions the LAD "does not define the specific conditions that fall within its sweep." Id. at 593, 538 A.2d 794. After then taking note of two cases involving common physical disabilities not specifically defined as handicaps by the statute, but which had been held, nonetheless, to come within its definition of "handicap," the Court said: "Similarly, we see alcoholism as falling within that definition." Ibid. By way of further explanation, the Court added this:
[A]s generally understood by the medical profession, alcoholism is a disease that manifests itself by both physical and psychological symptoms. Depending on the symptoms presented in any one case, an alcoholic might suffer from either a "physical disability [or] infirmity... which is caused by illness," or from a "mental [or] psychological ... disability resulting from psychological, physiological or neurological conditions which... is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques," N.J.S.A. 10:5-5(q), or both. We therefore hold that alcoholism is a handicap within the statute.

[Id. at 593-94, 538 A.2d 794.]
Obviously, "addiction to controlled dangerous substances" could easily replace "alcoholism" in this statement and the statement would remain medically accurate. But, the Court also emphasized that the Director of the Division on Civil Rights had decided as a matter of law that alcoholism is a protected handicap, noting that "[t]his Court ... places great weight on the interpretation given to a statute by the agency charged with its enforcement." Id. at 590, 538 A.2d 794.
Here, we do not have the benefit of the Director's view, but in the year following Clowes, the Attorney General addressed the subject in a formal opinion written to the Director, who had asked whether addiction to illegal drugs was a handicap under the LAD. In essence, the Attorney General determined that treatment of narcotics addiction as a handicap was contrary to the legislative policies reflected in the criminal laws governing controlled dangerous substances. N.J.A.G. Formal Opinion No. 1 (1989). Although opinions of the Attorney General on statutory construction are not controlling they are considered to be "strongly persuasive," Evans-Aristocrat Industries, Inc. v. Newark, 140 N.J.Super. 226, 230, 356 A.2d 23 (App.Div. 1976), aff'd on other grounds, 75 N.J. 84, 380 A.2d 268 (1977), and there is nothing in the record before us to suggest that the Division on Civil Rights has rejected that opinion. On the other hand, the Attorney General's opinion, written before the ADA was enacted, did not consider whether a distinction should be drawn between current use and past use followed by drug rehabilitation.
Clowes dealt with a legal drug and a handicap recognized by the Division on Civil Rights. Neither circumstance is present here. And yet, in Cahill, supra, 245 N.J.Super. at 400, 585 A.2d 977, another panel read Clowes as justifying its conclusion that addiction to an illegal substance is a handicap under the LAD. The entire analysis, which was dictum, consisted of this syllogism:
Alcoholism is a handicap under the Law Against Discrimination. Alcohol is a drug. Addiction, habituation or dependency which results from use of one drug or another ... renders a person handicapped.

*737 [Id. at 400, 585 A.2d 977 (citation to Clowes omitted).]
While the physical disabilities resulting from addiction to a controlled dangerous substance may be similar to those resulting from alcoholism, it does not follow that current use of the former is necessarily a handicap.
The validity of Cahill's dictum was questioned in In re Jackson, 294 N.J.Super. 233, 236 n. 1, 683 A.2d 203 (App.Div. 1996), certif. denied, 149 N.J. 141, 693 A.2d 110 (1997). The court observed that it appeared to be inconsistent with Judge Petrella's concurring opinion in A.B.C. v. XYZ Corp., 282 N.J.Super. 494, 660 A.2d 1199 (App.Div.1995), where he said:
Moreover, I do not interpret the statutory definition of "handicap" as affording a remedy under the LAD where the discrimination claim is based upon conduct by an individual claimant which would otherwise constitute a crime.... It strains credulity that the Legislature would prohibit [a criminal activity] on the one hand, but condone it on the other hand, by making it a protected handicap under the LAD.
[Id. at 508, 660 A.2d 1199 (Petrella, P.J.A.D., concurring).]
We understand Judge Petrella to be saying that current conduct of a criminal nature is not a handicap under the LAD. We agree with that statement and reject the contrary view espoused in Cahill. But neither case provides a fully satisfactory answer to the problem at hand, which brings us back to the ADA.
We look to the ADA for guidance because that course has been encouraged by the Supreme Court of this State. Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89, 97, 570 A.2d 903 (1990):
In a variety of contexts involving allegations of unlawful discrimination, this Court has looked to federal law as a key source of interpretive authority. The substantive and procedural standards that we have developed under the State's LAD have been markedly influenced by the federal experience.
Moreover, the Court went on to observe that it had earlier "approv[ed] of the use of `federal anti-discrimination statutes' in general ... when interpreting the LAD...." Ibid. (citing Shaner v. Horizon Bancorp., 116 N.J. 433, 437, 561 A.2d 1130 (1989)).
Section 12114 of the ADA, in pertinent part, addresses the problem of addiction to illegal drugs in this manner:
(a) Qualified individual with a disability
For purposes of this subchapter, the term "qualified individual with a disability" shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use.
(b) Rules of construction
Nothing in subsection (a) of this section shall be construed to exclude as a qualified individual with a disability an individual who
(1) has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;
(2) is participating in a supervised rehabilitation program and is no longer engaging in such use; or
(3) is erroneously regarded as engaging in such use, but is not engaging in such use;
except that it shall not be a violation of this chapter for a covered entity to adopt or administer reasonable policies or procedures, including but not limited *738 to drug testing, designed to ensure that an individual described in paragraph (1) or (2) is no longer engaging in the illegal use of drugs.
[42 U.S.C.A. § 12114. See also 42 U.S.C.A. § 12210.]
While maintaining the policies reflected by the laws criminalizing possession and use of controlled dangerous substances by treating current use as outside the handicap category, the federal law also recognizes that the effects of illegal drug abuse are similar to those resulting from alcoholism, thereby warranting handicap treatment when the employee has addressed the condition in an appropriate manner. This approach is sensible and fair. It is consonant with the views expressed in Clowes while simultaneously addressing the concerns expressed by the Attorney General.
As previously noted, the LAD, with "few exceptions ... does not define the specific conditions that fall within its sweep." Clowes, supra, 109 N.J. at 593, 538 A.2d 794. The Legislature has, for the most part, left that issue for determination by the courts, with the understanding that in appropriate cases we would look to the federal experience for guidance. See Grigoletti, supra, 118 N.J. at 107, 570 A.2d 903 (noting that the Court had "incorporated Title VII [of the Civil Rights Act of 1964] philosophy into the LAD, but [had] applied the Title VII standards with flexibility."). Similarly, we take this opportunity to incorporate the philosophy of sections 12114 and 12210 of the ADA into the LAD.
We turn next to the question whether the LAD as so interpreted provides support for plaintiff's case. In other words, is the summary judgment granted to defendants in this case sustainable? The answer is clearly yes.
As with any ruling on summary judgment, we must determine whether, giving the plaintiff the benefit of all favorable inferences, there are disputed issues of material fact that must be resolved by the fact-finder. R. 4:46-2(b). The motion must be granted only when the evidence is so one-sided that there is only one reasonable outcome. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
Under our interpretation of the LAD, the question is whether there is any evidence that plaintiff was discharged for drug addiction despite her successful completion of the drug rehabilitation program. In that regard, we note that under the policy of the EAP, the reason for plaintiff's hospitalization was to be treated as confidential. Although the EAP and the Employees Health Department had to be aware of plaintiff's condition and treatment program, that information was not to be made available to her supervisors. There is no evidence in this case that plaintiff's supervisors were informed on this matter; and, indeed, the evidence shows that they were not so informed and that their decision to discharge plaintiff was made before she even advised EAP of her drug problem. Therefore, defendants were entitled to summary judgment on this aspect of the case.
Relying on Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1980), plaintiff also made the claim that her dismissal after completion of the drug rehabilitation program violated public policy. Apart from the inadequacy of the evidence, that claim would nonetheless be barred because it does not seek to vindicate interests independent of those protected by the LAD. Catalane v. Gilian Instrument, 271 N.J.Super. 476, 492, 638 A.2d 1341 (App.Div.), certif. denied, 136 N.J. 298, 642 A.2d 1006 (1994)("[S]upplementary *739 common law causes of action may not go to the jury when a statutory remedy under the LAD exists.").

III
We next address plaintiff's claim that defendants failed to provide her with a reasonable accommodation for her hearing impairment, a condition expressly recognized as a handicap under the LAD, N.J.S.A. 10:5-5(q), and instead fired her.
Generally, a prima facie case of failure to accommodate requires proof that (1) the plaintiff had a LAD handicap; (2) was qualified to perform the essential functions of the job, with or without accommodation; and (3) suffered an adverse employment action because of the handicap. Seiden v. Marina Assoc., 315 N.J.Super. 451, 465-66, 718 A.2d 1230 (Law Div.1998).
Under the ADA, an employer's duty to accommodate extends only so far as necessary to allow "a disabled employee to perform the essential functions of his job. It does not require acquiescence to the employee's every demand." Vande Zande v. State of Wis. Dep't of Admin., 851 F.Supp. 353, 362 (W.D.Wis.1994), aff'd, 44 F.3d 538 (7th Cir.1995). Accord Schmidt v. Methodist Hosp., 89 F.3d 342, 344 (7th Cir.1996) ("Reasonable accommodation does not require an employer to provide literally everything the disabled employee requests."). The LAD should be similarly interpreted.
Summary judgment was properly granted in this case because the overwhelming evidence was that despite plaintiff's hearing impairment and desire for a special stethoscope, the defendants were completely satisfied that the impairment did not affect her ability to perform her job. Furthermore, there was no medical evidence that plaintiff's hearing, as corrected by her own hearing aids, was less than normal. Although the defendants attempted to satisfy plaintiff's desire for a particular accommodation that she alone thought was necessary, they were unsuccessful in locating the device she described. Nevertheless, they agreed to purchase the alleged item for her if she could locate it. She tried to do so but failed. The circumstances leading to plaintiff's discharge demonstrate that the action was taken solely because she committed a serious violation of HUMC's policy when she altered the medical record.

IV
The last issue we will discuss is plaintiff's claim of breach of contract.[2] Although plaintiff admits that she was hired as an at-will employee, she contends her dismissal violated the "Return to Work Agreement" which was executed on her return from the drug treatment program.
The agreement is devoted primarily to a description of conditions relating to the regimen of drug monitoring and follow-up care to which plaintiff would be subjected on her return to work. It concludes with the statement: "I understand that if I do not comply with the requirements of this contract, I may be disciplined, up to and including termination." The provisions on which plaintiff relies for her claim of breach of contract read as follows:
I further acknowledge that I have been allowed an opportunity to go to a treatment program and will be allowed to return to my position.

*740 In exchange for being allowed the opportunity to go to a treatment program and return to my position, I agree to the following conditions:
....
The interpretation of the terms of a contract are decided by the court as a matter of law unless the meaning is both unclear and dependent on conflicting testimony. Deerhurst Estates v. Meadow Homes, Inc., 64 N.J.Super. 134, 152, 165 A.2d 543 (App.Div.1960), certif. denied, 34 N.J. 66, 167 A.2d 55 (1961). Since we are not confronted with any testimonial disputes regarding this agreement, we will determine its legal effect.
In Deerhurst, we described the primary principle of contract interpretation as follows:
The settled primary standard of interpretation of an integrated agreement is the meaning that would be ascribed to it by a reasonably intelligent person who was acquainted with all the operative usages and circumstances surrounding the making of the writing.... The theory behind this primary standard is that since almost all language is susceptible of more than one reasonable construction, the attendant circumstances are always relevant in ascertaining the intending meaning.

[Id. at 149, 165 A.2d 543 (citations omitted).]
We also referred to this secondary standard:
[A] contracting party who manifests his intention ambiguously will generally be held to that meaning that he induces another to understand and rely upon, provides he knows that the other will so understand.

[Id. at 149-50, 165 A.2d 543 (citations omitted).]
Plaintiff contends that this agreement means that she could be fired only for activity occurring after she returned to work. Defendants argue that the agreement, a standard form required of all employees returning from drug treatment, "manifests Plaintiff's agreement to random drug-testing and to attend counseling, nothing else."
Given the surrounding circumstances, we agree with defendants. Following her immediate suspension for altering the hospital record, plaintiff had to be aware that her job was at risk. Although she may not have believed that her action constituted alteration of a record, she knew that her employer believed it did and considered the matter a serious breach of hospital policy. Furthermore, she had been advised that her supervisor would "get back" to her after consultation with higher authorities in the hospital. Although the agreement refers to plaintiff's reinstatement, it does so solely in the context of her successful completion of the drug treatment program; it says nothing about prior conduct unrelated to drug use or to pending disciplinary matters. No reasonable person would construe the agreement in the manner suggested by plaintiff. Nor did she rely on such a construction in any substantial way by merely being tested for the presence of drugs and reporting for duty. Consequently, under the principles laid out in Deerhurst, supra, defendants were entitled to summary judgment on this count of the complaint.
Affirmed.
NOTES
[1] Plaintiff is not, however, appealing the dismissal of her case against Moslowski.
[2] Plaintiff's remaining arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).