**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1454-18

PORT-MAN-GB ASSOCIATES,
LLC,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

RENAISSANCE AT SCHANCK
ROAD, LLC,

      Defendant/Third-Party
      Plaintiff-Appellant/Cross-
      Respondent,

v.

TRIDENT ENVIRONMENTAL
CONSULTANTS,

      Third-Party Defendant-
      Respondent,

and

ADMA, INC., KOO KIM,
individual, and STEPHANIE
KIM, individual,

Third-Party Defendants,

and

BAIK YANG CLEANERS,

 Third-Party Defendant/
 Fourth-Party Plaintiff-
 Respondent,

v.

KYUNGIN CLEANERS, INC.,

 Fourth-Party Defendant.
_____

RENAISSANCE AT SCHANCK
ROAD, LLC,

 Plaintiff,

v.

PORT-MAN-GB ASSOCIATES,
LLC, and THE SYLVIA B.
DEANGELO LIVING TRUST,

 Defendants.
_____

Argued November 18, 2020 – Decided March 10, 2022

Before Judges Accurso, Vernoia, and Enright.

On appeal from the Superior Court of New Jersey,
Law Division, Monmouth County, Docket Nos.
L-2688-13 and L-2763-13.

Dennis J. Krumholz argued the cause for appellant/ cross-respondent Renaissance at Schanck Road, LLC (Riker Danzig Scherer Hyland & Perretti, LLP, attorneys; Dennis J. Krumholz, of counsel; Michael S. Kettler, on the briefs).

Neal Herstik argued the cause for respondent/cross-appellant Port-Man-GB Associates, LLC (Gross, Truss & Herstik, PC, attorneys; Neal Herstik, of counsel; Anthony J. Monaco, on the briefs).

The opinion of the court was delivered by

ACCURSO, J.A.D.

This is a dispute over responsibility for the costs of an environmental cleanup at a shopping center in Freehold. Defendant Renaissance at Schanck Road, LLC appeals from a July 27, 2018 order, subsequently memorialized in the August 21, 2018 judgment, requiring it to reimburse its landlord, plaintiff Port-Man-GB Associates, LLC, $180,230 and to complete the remediation of the shopping center property.[1] Port-Man cross-appeals from a provision in the August 21, 2018 judgment declaring Renaissance not liable to Port-Man for

---

[1] Renaissance also appealed a January 30, 2017 order denying its motion to re-open discovery to permit it to file a supplemental expert report. As it failed to brief that issue, however, we deem it waived. See Sklodowsky v. Lushis, 417 N.J. Super 648, 657 (App. Div. 2011).

obligations arising before November 14, 2007, the date Renaissance became Port-Man's tenant by way of assignment.

For reasons we explain below, we conclude the trial judge's construction of the Renaissance lease assignment is correct, and thus affirm the provision of the August 21, 2018 order declaring Renaissance responsible only for contamination occurring after November 14, 2007. We find the court erred, however, in deeming Renaissance judicially estopped from asserting the environmental contamination did not occur after the effective date of its assignment. And because it is undisputed plaintiff Port-Man has never offered any proof as to when the contamination occurred, we conclude Port-Man failed to establish Renaissance's liability under the lease by proving the contamination occurred after Renaissance came into possession. We accordingly reverse the judgment against Renaissance and remand for dismissal of Port-Man's complaint.

This matter has a long and complicated history spanning several different but related lawsuits involving a number of different entities and a myriad of claims, most of which are not germane to the two questions we address here. Because we write only for the parties, who are familiar with the facts and the case history, we confine ourselves to what is essential to

A-1454-18

understand our holding. The property is owned by the Silvia B. DeAngelo Living Trust. In 1971, the Trust entered into a ground lease with Lenco Associates. Lenco, in turn, leased the property to Supermarkets General Corporation, later known as Pathmark Stores, Inc. Pathmark developed a shopping center on the property. Among the shopping center tenants from 1979 through 2009 was a dry cleaner.

In 1989, Lenco assigned its interest in the ground lease and its interest in its 1971 lease with Pathmark to Port-Man. In 2007, Pathmark assigned its interest in the 1971 Lenco lease, and its interest in the subleases with the shopping center tenants, to Renaissance; Renaissance thereby becoming Port-Man's tenant under the 1971 Lenco lease and the landlord under the subleases with the shopping center tenants. The first paragraph of the 2007 agreement between Pathmark and Renaissance states:

> Assignor hereby agrees to assign the [Lenco] Lease and Subleases to Assignee and Assignee hereby agrees to accept such assignments and <u>to assume all of the obligations of the tenant under the [Lenco] Lease which accrued from and after the date of the Assignment</u>, and sub-landlord under the Subleases, subject to the terms and conditions of this Agreement.
>
> [Emphasis added.]

A-1454-18

The actual assignments of the Lenco lease and the tenant subleases echo that limitation on Renaissance's liability. Thus, the lease assignment provides that Pathmark "does hereby sell, assign and transfer to Renaissance . . . all of [Pathmark's] right, title and interest in the [Lenco lease]," and Renaissance, in consideration,

> hereby expressly assumes and agrees for the benefit of [Pathmark] and [Port-Man, as successor-in-interest to Lenco], their successors and assigns, to perform, observe and abide by all of the terms, covenants, conditions and obligations contained in [the Lenco lease] on the part of [Pathmark] to be kept, observed and performed thereunder . . . <u>excluding obligations, actual or contingent, of the Lessee which may have arisen on or prior to the Effective Date</u>. Nothing in this Agreement shall be construed to release [Pathmark] from liability under the [Lenco] Lease.
>
> To the fullest extent permitted by law, [Pathmark] expressly agrees to indemnify [Renaissance] from and against any and all losses, claims, damages and expenses including reasonable attorney fees arising under the Lease at any time prior to the date hereof.
>
> [Emphasis added.]

Similarly, in the sublease assignment, Pathmark transferred all of its right, title and interest in the subleases to Renaissance, and Renaissance accepted the assignment, acceded to Pathmark's rights and assumed all of its obligations under the subleases, but for those that arose prior to the effective

6

date of the assignment. The sublease assignment contained the same indemnification provision included in the lease assignment, to wit: "[n]othing in this Assignment shall be construed to release [Pathmark] from liability under the Subleases."

In connection with its transaction with Pathmark, Renaissance hired Trident Environmental Consultants to conduct a Phase I Environmental Site Assessment of the property. Trident completed its investigation in May 2007, and while noting a dry cleaner had been operating in the shopping center since 1979, opined "that no environmental concerns are anticipated."

In December 2007, Pathmark timely notified Port-Man of the lease assignment by providing it an executed copy. Pathmark was not obligated under the 1971 Lenco lease to obtain Port-Man's consent to the assignment. Nevertheless, that lease provided that no assignment would be valid

> unless it is evidenced by a written and acknowledged instrument executed by the assignor and the assignee <u>whereby such assignee shall expressly accept and assume and agree to perform and be bound by all of the terms, covenants and conditions in this Lease to be kept, observed or performed by Tenant</u>, and one executed original of such instrument, together with the address of the assignee, shall be delivered to Landlord.
>
> [Emphasis added.]

A-1454-18

Although Port-Man filed suit to attempt to block Pathmark's assignment to Renaissance, its application for an injunction was denied and it ultimately acquiesced in the assignment, negotiating with Renaissance an amendment to the 1971 Lenco lease the parties executed the following June. In the amendment, Renaissance agreed to additional rent and repair obligations and Port-Man expressly acknowledged Renaissance's assignment and agreed to cooperate in Renaissance's land use applications to improve and operate the shopping center.

In 2009, Port-Man embarked on a refinance and, at the request of its lender, engaged Brennan Environmental, Inc. to perform a Phase I assessment of the property. In the course of its site inspection, Brennan observed a ten-gallon plastic drum in the dry cleaner tenant's space "labeled as containing waste PCE" (tetrachloroethylene or Perchloroethylene, aka PERC), a dry cleaning solvent. Although advised the dry cleaning machine operated by the current dry cleaner tenant, Kyungin Cleaners, Inc., did not use PCE, Brennan thought it likely a prior machine did. Soil and groundwater sampling revealed PCE and trichloroethylene (TCE) at levels exceeding State standards, and New Jersey Department of Environmental Protection records revealed a dry cleaning operation in the space had "been a registered disposal facility"

8

generating "spent solvents and solvent mixtures," i.e., TCE and PCE, since 1988.

Renaissance retained a new environmental consultant, Grelis Environmental Services, LLC, which confirmed the presence of PCE-contaminated soil beneath the dry cleaner tenant space and underneath the pavement behind its premises. Grelis reported the contamination to the DEP in November 2009, and Renaissance engaged a qualified site remediation contractor to remove the contaminated soil.

In August 2010, Renaissance filed suit to recover those remediation costs from Pathmark, Kyungin, and The Great Atlantic & Pacific Tea Company, the entity that had purchased Pathmark's assets. Pathmark filed for bankruptcy a few months later. In early 2011, Renaissance filed an amended complaint asserting a claim against Kyungin for $303,948.41 in remediation costs.

When Kyungin failed to answer, default was entered, and a proof hearing was held before Judge Kapalko. Two witnesses testified. John Grelis, testified about soil borings taken outside the building and below the concrete floor in the areas of suspected contamination, including where the current and former dry cleaning machines were located and the dry cleaner's spotting

9

station. Grelis claimed the borings confirmed the soil beneath the floor of the tenant space and below the pavement behind it had been contaminated with PCE, and that he saw Kyungin using PCE at the facility during his investigation.

Grelis testified a contractor retained by Renaissance removed the contaminated soil from beneath the floor. Although the contractor had excavated another area, twenty-five-foot square, behind the dry cleaners to a depth of seven or eight feet, Grelis testified there remained "considerable contamination" within that area that "still has to be addressed." Grelis added, "[b]ut that's clearly not Renaissance's issue because they've only been involved with the property as a sub-lessee for a year-and-a-half, two years and never operated the dry cleaning." Asked whether the PCE contamination in that outside area was related to the operation of Kyungin Cleaners, Grelis replied, "no question."

The other witness to testify was Thomas Primavera, Renaissance's general counsel. He explained Renaissance decided to purchase Pathmark's leasehold interests after Trident advised the use of PCE in the dry cleaning operation had ended in 2002 and "there were no telltale signs of contamination at the property." He testified Renaissance's investigation into the history of

the dry cleaning operation was incomplete. Primavera explained Renaissance had evicted Kyungin from the shopping center for non-payment of rent at the end of 2009, and Kyungin had not responded to the pleadings in the current action. He testified the anecdotal evidence suggested Kyungin had operated the dry cleaners since the shopping center opened in 1976.

According to Primavera, Renaissance's goal had been "to render the building useful," leading it to jackhammer the floor of the dry cleaner as well as some adjacent space, remove the soil underneath, and, upon being satisfied the remaining level of contamination was to residential standards, replace the floors. He testified to the costs incurred by Renaissance, identified the sublease between Pathmark and Kyungin dated October 6, 1992, and the sublease assignment, and testified the assignment and the sublease with Kyungin permitted Renaissance to recover its remediation costs from Kyungin.

After hearing the testimony, Judge Kapalko put his opinion on the record entering judgment against Kyungin for $303,948.41. The judge found Kyungin had contaminated the premises by its use of tetrachloroethylene, a substance "commonly identified with dry cleaning establishments and . . . one no longer permitted to be utilized under the law." He accepted Grelis's testimony that he saw Kyungin still using the "substance on its site even at that

11

time in violation of the law and therefore, in violation of its [sub]lease covenants," and that the sublease assignment and the terms of the sublease permitted Renaissance to recover its costs to remediate the damage.

By the time of the default hearing, the DEP had already issued a Notice of Violation to the DeAngelo Trust and Kyungin. Because Port-Man was required to indemnify the DeAngelo Trust under the terms of the ground lease, Port-Man hired a licensed site remediation professional to conduct a limited investigation of environmental conditions at the property. It followed with the complaint in this action alleging Renaissance breached the 1971 Lenco lease by failing to fully remediate the contamination on the property and seeking an injunction requiring Renaissance to complete all remediation required by the DEP.

Renaissance followed with its own action against Port-Man and the DeAngelo Trust. Port-Man answered and counterclaimed for a declaratory judgment that Renaissance was obligated by the Lenco lease and its assignment from Pathmark to complete the remediation. Renaissance also filed a third-party complaint in the case brought by Port-Man against Trident, for professional negligence, and three dry cleaner subtenants that had leased the space before Kyungin for contribution under the New Jersey Spill

12

Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24. One of the dry cleaners, Baik Yang, filed a fourth-party complaint against Kyungin for contribution under the Spill Act. A new judge consolidated the cases.

During discovery in these matters, Grelis was deposed. He testified he couldn't say when the contamination in the dry cleaner's tenant space occurred but opined the extent of it suggested the discharge was not recent, and that he'd reviewed documents leading him to believe "it could have occurred more than 20 years ago." He claimed the staining he observed on the floor behind the spotting station in the course of his 2009 investigation was not fresh, and his testimony at the proof hearing about Kyungin's then-current use of PERC was based on seeing a bottle on the spotting station that listed PERC among the ingredients.

Grelis believed the spotting station likely contributed to the PERC found beneath the floor "[b]ut that certainly was not responsible for the gross contamination found out behind the building." He testified the worst of the contamination was directly outside the back door and believed it was most likely caused by "dumping outside the back door, waste disposal and dumpsters."

In July 2016, the new judge denied a summary judgment motion by Port-Man seeking to declare Renaissance liable to Port-Man for the cleanup and granted summary judgment to Trident and Baik Yang dismissing Renaissance's third-party complaint. Although neither Port-Man nor Renaissance has pursued an appeal from those orders,[2] the judge's findings on the motions informed her subsequent decision resolving Renaissance's responsibility to remediate the contamination at the shopping center — which is before us.

The judge found on the undisputed motion record that the dry cleaning business had been operated by Adma, Inc. from August 1979 to February 1983, Baik Yang from February 1983 to August 1989, Koo and Stephanie Kim from September 1989 until August 1992, and Kyungin from October 1992 until November 2009, and that "Port-Man and DeAngelo allege that these dry cleaners used hazardous substances, including tetrachlorethylene, referred to as PCE, as a dry cleaning solvent . . . [a]nd discharged PCE at the property."

The judge recounted that Chung Ang, the owner of Baik Yang, testified at deposition that when he purchased the dry cleaning business in February 1983, the purchase included a dry cleaning machine that used PERC.

---

[2] Renaissance appealed from the summary judgment in favor of Baik Yang but has since settled its claim against the dry cleaner and dismissed its appeal against it.

A-1454-18

According to Ang, the PERC was delivered "in a big car." For two or three years, he put the chemical waste remaining after the PERC was used in the machine in a plastic bag and threw it in the garbage. Later, the waste was stored in a container on the premises and periodically removed by a company. Ang claimed that he was not aware of any discharge of PERC occurring during his tenancy. The judge found Ang sold the machine that used PERC to the Kims when he sold them the business.

The judge denied Port-Man's summary judgment motion, finding the "agreements in question contain[ed] no specific reference to hazardous substances, environmental contamination, or the allocation of responsibility for environmental remediation," and they needed to be interpreted "in the context of a full and complete record" at trial.

The judge granted the motions of Trident and Baik Yang, finding although there was evidence "Baik Yang used PERC in its dry cleaning operation for a period of two to three years, Renaissance [had] produced no facts from which [the judge could] conclude that a spill occurred during Baik Yang's leasehold." The judge noted Renaissance "established through Grelis's testimony at the proof hearing that Kyungin was responsible for the PERC contamination that was present in 2009" but had not "presented any competent

facts which would tend to prove the contamination was also present during Baik Yang's tenancy or in 2007 when the phase one was performed by Trident." The judge noted Renaissance had not produced expert opinion dating the contamination to Baik Yang's tenancy or to any time before 2007.

The judge concluded Renaissance "failed to raise an issue of material fact regarding the existence of a PERC discharge by Baik Yang prior" to Renaissance coming into possession in 2007, "or to come forward with facts from [which] a reasonable fact finder could conclude that Trident's negligence [bore] a causal relationship to the remediation costs that were incurred after the date of its reports."

Following the denial of Renaissance's motion to reopen discovery to permit it to obtain an expert report dating the contamination, Port-Man and Renaissance went to trial on the limited issue of which of them bore responsibility for the environmental remediation under their agreements.[3] Port-Man presented the testimony of Carl P. Gross, the principal of its management company, GB Limited Oper. Co., who described that entity as "a

---

[3] Port-Man and Renaissance had asserted Spill Act claims against one another, but ultimately agreed the lease documents and assignment would control which of them should be responsible for the cleanup. Renaissance has conceded the approach makes it impossible for it to recover its voluntarily incurred remediation costs from Port-Man as the lease does not provide for it.

A-1454-18

management company that manages all the entities I have an ownership in."  A former practicing lawyer, Gross negotiated the lease amendment with Renaissance following Pathmark's assignment.

Gross testified Port-Man had no right to approve subleases or assignments of the 1971 Lenco Lease, but only to be notified of any assignment within thirty days.  According to Gross, he "perused" the assignment when he received it, a few weeks after its execution, and passed it along to his lawyers.  He understood "Pathmark had assigned 100 percent of the lease to Renaissance, and that as between Pathmark and Renaissance their side deal was that Pathmark would be responsible for anything prior to the assignment, and Renaissance would be responsible for anything after."

As to the negotiations between Port-Man and Renaissance over the lease amendment, Gross testified there had been discussion about whether the term "consent" or "acknowledge" should be used to describe Port-Man's conduct with respect to the assignment.  He maintained Port-Man did not want to consent to the assignment, and that its consent was not required.  Port-Man agreed to acknowledge "this was [Renaissance's] deal with Pathmark." According to Gross, under the amendment, the 1971 Lenco lease remained in place except to the extent modified by the amendment.  He maintained the

statement in the amendment acknowledging Renaissance's assignment was not intended to bind Port-Man to the division of pre- and post-assignment liabilities agreed to by Pathmark and Renaissance in the assignment.

Gross testified Port-Man was not aware of any contamination at the property, and the parties had not discussed environmental contamination when the lease amendment was executed. Port-Man only discovered the contamination when it was planning to refinance, and its lender required a Phase I investigation. After the DEP issued its Notice of Violation, Port-Man determined its lease with the DeAngelo Trust required it to assume the trust's responsibilities for remediation. Port-Man met with Renaissance, who refused to undertake any further remediation, and the parties agreed Port-Man would proceed with the compliance steps required by DEP without prejudice to its rights against Renaissance.

On cross-examination, Gross testified he could not recall having any discussions about the clause in the assignment excluding obligations arising prior to its effective date with his partners, attorney or anyone from Renaissance, but admitted he "most likely" discussed it with his attorney. When asked how he acquired his understanding of the "side deal" between Pathmark and Renaissance he testified to on direct examination, Gross

18

explained he got it from the document, which in "the first full paragraph, assigns all of the interests in the lease" and "[l]ater on, when it divides up as between Pathmark and Renaissance, that was their deal." He testified he didn't "specifically" recall discussing the assignment's indemnification clause with anyone, "but to me, that made it clear that that was the deal between Pathmark and Renaissance. That had . . . nothing to do with me."

Gross insisted he did not want to consent to the assignment because Port-Man was not a party to the agreement between Pathmark and Renaissance and was not involved in negotiating it. He claimed "[t]hat was their deal." Gross acknowledged the letters in evidence between Renaissance and Port-Man exchanged during their negotiation of the lease amendment, in which Renaissance requested and Port-Man agreed to "consent to and acknowledge the assignment to Renaissance." He explained, however, that as the parties "got through the negotiations, I said, what in the world am I consenting to, because that's not my deal." He decided he would "acknowledge that they have this arrangement. I'll acknowledge that they are the tenant, but . . . I'm not consenting to any side arrangements they have between them." Asked whether he ever communicated those thoughts to Renaissance, Gross admitted he hadn't, but was "sure the attorneys did," because it "was a negotiated item."

A-1454-18

Robert McDaid, managing member of Renaissance, testified he negotiated, with Renaissance's counsel, the 2007 agreement with Pathmark to take over its interest in the Lenco lease. He understood the phrase in their agreement stating Renaissance agreed to accept the assignment and to "assume all of the obligations of the tenant . . . which accrued from and after the date of the Assignment" to mean that Renaissance was not "responsible for anything prior to the date of this agreement that occurred while Pathmark was in operation." Similarly, language in the assignment and sublease assignment "excluding obligations . . . which may have arisen on or prior to the Effective Date," and providing for indemnification of Renaissance by Pathmark for any losses or claims occurring before the effective date of those agreements, meant that Pathmark would protect Renaissance "to the fullest extent possible" and that Pathmark was responsible for anything occurring prior to the effective date. According to McDaid, the indemnification clause was "the most significant part of the agreement" for Renaissance.

As to his negotiations with Port-Man resulting in the lease amendment, McDaid understood from the exchange of correspondence that Port-Man had agreed to consent to and acknowledge the assignment. He did not recall having any discussions with Port-Man regarding the limited nature of the

20

assumption of liability expressed in the assignment and sublease assignment or the indemnity provisions. McDaid confirmed Gross's testimony that there were no discussions with Port-Man about environmental issues.

McDaid testified he was not aware of any contamination at the shopping center during his negotiations with Port-Man because Trident hadn't reported any environmental concerns. According to McDaid, Renaissance had already begun construction on the property when the contamination was discovered and was under some tight deadlines to complete it. He testified there was no time at that point to figure out who was going to remove the contaminated soil, so Renaissance undertook as much remediation as required to satisfy the licensed site remediation professional and the town to allow construction to continue.

Renaissance's general counsel, Primavera, testified he negotiated the contracts with Pathmark on behalf of Renaissance. He explained the intent of the language in the 2007 agreement whereby Renaissance agreed to accept the assignment and assume all obligations "which accrued from and after the date of the Assignment" was to permit Renaissance to "receive all of the remaining rights under the lease for the term, but to only accept the liabilities which came into being after the assignment became effective." He claimed he "didn't want

Renaissance to be responsible for any liabilities that arose during Pathmark's tenure," such as taxes, assessments, claims by vendors or invitees on the property, and fines or claims by governmental entities.

Primavera claimed the same limiting language was included in the assignment and sublease Assignment for the same reason. He testified that without it, he wouldn't have advised Renaissance to execute the assignment because "there would be too many unknowns in a situation like that where [a] shopping center operator has been in business at a site for 27 years, 28 years." According to Primavera, the purpose of the indemnification clause was to protect Renaissance against claims by third parties that arose prior to the assignment.

Primavera maintained that during the negotiations for the lease amendment with Port-Man, there were no discussions as to environmental rights and obligations, the limited assignment undertaken by Renaissance, or the indemnification clause in that assignment. He also explained that when he testified at the proof hearing before Judge Kapalko, he did not know the identity of any of the entities that had operated the dry cleaners before Kyungin, but only learned of them in the course of discovery in these consolidated matters.

Following the conclusion of the two-day trial, the judge put her findings and legal conclusions on the record, noting "[t]he circumstances of this case present a complex and often acrimonious series of transactions between sophisticated businesspeople." Specifically, the judge found these experienced and sophisticated real estate investors

> were anxious to make a deal on terms that best suited their immediate interests. Once Port-Man realized that it could not re-take the property from Pathmark and that Renaissance was anxious to acquire the property, Port-Man set out to exact as many concessions as possible from Renaissance.
>
> Renaissance ultimately agreed to a substantial increase in rent and to relieve Port-Man of ongoing costs for roof repair, structural repair, and replacement. In exchange, Port-Man gave virtually nothing other than the agreement not to interfere with the redevelopment and to cooperate in Renaissance's application for site plan approval and financing.

The judge further found

> [t]he credible evidence indicates that with all of these understandings, Renaissance wished to insulate itself from any preexisting claims or liabilities incurred by Pathmark before the assignment. The credible evidence also indicates that Port-Man had little concern about the arrangements between Pathmark and Renaissance, particularly when Port-Man still had the ability to pursue Pathmark, the deepest pocket in 2007, in the event of liability for a pre-assignment loss.

23

The judge rejected Port-Man's argument "that it understood the assignment and assumption of the lease to be a complete assignment of Pathmark's lease to Renaissance with a private or 'side' agreement between Renaissance and Pathmark regarding the allocation of potential liabilities based upon time of accrual." Instead, she found "Port-Man's reliance on its own interpretation of the assignment as a 'side deal' between Pathmark and Renaissance was misplaced and contrary to the plain language of the contracting parties." She accordingly concluded the assignment was valid and binding, and Renaissance, by its clear and unambiguous terms, did not assume obligations arising before its effective date.

The judge expressly rejected Port-Man's argument that the 1971 Lenco lease's prohibition on partial assignments rendered the Renaissance assignment invalid, finding Port-Man "acquiesced to the terms of the assignment without reservation and [could] not now claim that Renaissance [was] responsible for losses that predated the assignment." The judge noted the Lenco lease permitted assignments without consent of the landlord, requiring only that "there be a complete assignment of all obligations under the lease and that the landlord be provided with a copy of the written assignment within 30 days of execution." She found the notice provision was obviously "intended to give

the landlord an opportunity to review the assignment and a reasonable opportunity to contest [its] validity . . . if the landlord so chose." See Garden State Bldgs., L.P. v. First Fid. Bank, N.A., 305 N.J. Super. 510, 524 (App. Div. 1997) (noting an anti-assignment clause may be waived by written agreement, a course of dealing, or failing to take action to invalidate the assignment).

The judge noted there was no dispute that Pathmark timely provided Port-Man a copy of the assignment, which Gross reviewed and distributed to Port-Man's partners and attorney. She found Port-Man never objected to or challenged the terms of the assignment — either when it was first provided a copy in December 2007 or at any time leading up to the execution of the lease amendment six months later — notwithstanding Gross's admission that he "most likely" discussed the language limiting Renaissance's obligations with his counsel. The judge concluded

> [t]he reasonable inference to be drawn from all these facts is that Port-Man was aware . . . Pathmark, and Renaissance had negotiated a liability retention by Pathmark as part of the assignment, but Port-Man was satisfied that Pathmark's continuing obligation would be sufficient to protect Port-Man in the event of a pre-assignment loss. Environmental contamination or other potential liabilities predating the assignment did not appear to be in the forefront of any of the parties' minds during the post-assignment negotiations.

25

> Rather, it appears that the driving force behind the actions of both Port-Man and Renaissance was the desire to 'seal the deal' with Port-Man receiving more rent and relief from its continuing obligation for roof and structural repairs, and Renaissance being able to move forward on its project without concerns about interference from Port-Man.

The judge further noted Port-Man accepted rent from Renaissance "and acted in compliance with the [Lenco] lease and assignment" for nearly ten years and only challenged the validity of the assignment in the current litigation. She found it beyond question that "the issue of the assignment would not have been raised but for Pathmark's subsequent insolvency," which "left both Port-Man and Renaissance without recourse under the lease."

Although determining Renaissance was only responsible "for those liabilities that arose after the assignment from Pathmark," and rejecting Port-Man's claim that Renaissance was "judicially estopped from . . . claiming that the environmental contamination occurred prior to 2007," the judge nevertheless concluded Renaissance was "judicially estopped from now claiming that contamination did not occur after the 2007 assignment" based on the record at the proof hearing before Judge Kapalko.

The judge noted Renaissance had filed a lawsuit against Kyungin, which had operated the dry cleaners from 1992 to 2009, for reimbursement of

26

Renaissance's remediation costs. She rejected Port-Man's claim that Renaissance should be judicially estopped from asserting the contamination took place before 2007, because "proof of a release prior to 2007 was not an element of Renaissance's breach of lease claim" against Kyungin. The judge remarked she based her findings "upon the lack of proof establishing a pre-2007 release, not the application of the doctrine of judicial estoppel."

Although rejecting Port-Man's theory, the judge nevertheless found application of the doctrine of judicial estoppel appropriate based on the record Renaissance created at the proof hearing before Judge Kapalko. The judge noted at that hearing, Renaissance produced evidence that PCE contamination was detected in 2009. She explained that while Renaissance offered evidence "that Kyungin had operated the cleaners 'for many years,' the only evidence of PCE use came from Grelis's testimony regarding his observations at the time of his site inspection in 2009." "Accepting Renaissance's position that it did not assume any liability under the assignment and lease for damages that occurred prior to the assignment," the judge reasoned that "Renaissance could only pursue a breach of lease claim against Kyungin if the contamination occurred after the lease assignment in November of 2007." Accordingly, the

27

court concluded Renaissance was judicially estopped from claiming in this action that contamination did not occur after its 2007 assignment.

The judge accordingly dismissed Renaissance's complaint against Port-Man in its entirety and granted Port-Man's claim against Renaissance for reimbursement of Port-Man's remediation costs in the sum of $180,230 and declared Renaissance responsible to complete the remediation of the property in compliance with DEP requirements. Renaissance's motion for reconsideration was denied, and this appeal and cross-appeal followed.

We begin our analysis by dispatching Port-Man's cross appeal. The construction of contract language is generally a question of law unless its meaning is unclear and turns on conflicting testimony. Bosshard v. Hackensack Univ. Med. Ctr., 345 N.J. Super. 78, 92 (App. Div. 2001). Here, the judge denied Port-Man summary judgment on its claim that Pathmark assigned the entirety of its interest in the Lenco lease to Renaissance because the Lenco lease prohibited partial assignments, finding the 1971 Lenco lease, the Pathmark/Renaissance agreement and assignment, and the amendment to the Lenco lease Port-Man and Renaissance executed in June 2008 needed to be interpreted "in the context of a full and complete record" at trial.

28

Having had the opportunity to hear the principals testify about the negotiation of their serial agreements and what they intended and understood them to mean, the judge had no hesitation in finding the language of the assignment, by its "clear and unambiguous" terms, limited Renaissance's assumption of liabilities under the Lenco lease to those accruing after the effective date of the assignment. Reviewing the language de novo, see Kieffer v. Best Buy, 205 N.J. 213, 222 (2011), we have no hesitation in concluding she was correct. The language admits of no other interpretation. See Karl's Sales & Serv. v. Gimbel Bros., 249 N.J. Super. 487, 493 (App. Div. 1991) (noting "where the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written"). Port-Man's argument that the circumstances surrounding execution of the document — to which it was not a party — show Pathmark and Renaissance intended something other than what they expressed in the plain language, is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

The judge's factual finding that Port-Man knew "Pathmark, and Renaissance had negotiated a liability retention by Pathmark as part of the assignment," but was "satisfied that Pathmark's continuing obligation would be

29

sufficient to protect Port-Man in the event of a pre-assignment loss" and thus posed no objection to the partial assignment, and instead acknowledged its validity, has ample support in the record and is thus binding on appeal. See Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). We accordingly affirm that provision of the August 21, 2018 judgment declaring Renaissance not liable to Port-Man under the 1971 Lenco lease for obligations arising before November 14, 2007.

We come to a different conclusion about the judge's application of judicial estoppel. As our Supreme Court has explained, "[j]udicial estoppel is an extraordinary remedy," one that "should be invoked only to prevent a miscarriage of justice." Bhagat v. Bhagat, 217 N.J. 22, 37 (2014). Its purpose "is to protect 'the integrity of the judicial process,'" Kimball Intern., Inc. v. Northfield Metal Prods., 334 N.J. Super. 596, 606 (App. Div. 2000) (quoting Cummings v. Bahr, 295 N.J. Super. 374, 387 (App. Div. 1996)), "by preventing a party from abusing [it] through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment," Teledyne Indus., Inc. v. NLRB, 911 F.2d 1214, 1218 (6th Cir. 1990).

"Thus, the doctrine is not invoked unless a court has accepted the previously advanced inconsistent position and the party advancing the inconsistent position prevails in the earlier litigation." Bhagat, 217 N.J. at 37. As we noted in Kimball, "[j]udicial estoppel is applied with caution to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement."[4] 334 N.J. Super. at 608 (quoting Teledyne, 911 F.2d at 1218). We review its application for abuse of discretion. Terranova v. GE Pension Tr., 457 N.J. Super. 404, 410 (App. Div. 2019).

The judge's application of the doctrine here was based on Renaissance's proofs in the default hearing before Judge Kapalko in its action to recover its voluntarily assumed remediation costs from Kyungin. The judge explained that "[a]ccepting Renaissance's position that it did not assume any liability under the assignment and lease for damages that occurred prior to the

---

[4] As we also noted in Kimball Intern., Inc. v. Northfield Metal Prods. and the Court noted in Bhagat v. Bhagat, 217 N.J. 22, 37 (2014), the doctrine has come under strong criticism from some academics, see Douglas W. Henkin, Comment, Judicial Estoppel-Beating Shields Into Swords and Back Again, 139 U. Pa. L. Rev. 1711 (1991), because of "the harshness of claim or issue preclusion based solely on a party asserting inconsistent positions, without a showing of prejudice to another party," 334 N.J. Super. 596, 608 n.4 (App. Div. 2000).

assignment, Renaissance could only pursue a breach of lease claim against Kyungin if the contamination occurred after the lease assignment in November of 2007." She thus deemed Renaissance judicially estopped from asserting in this action that the contamination did not occur after the effective date of its assignment.

But the judge's premise is not accurate. By the express terms of Renaissance's 2007 agreement with Pathmark and the sublease assignment, Renaissance acceded to all of Pathmark's rights under both the Lenco lease and the subleases; those agreements only limited Renaissance's pre-assignment liabilities. Pathmark's retention of those liabilities did not affect Renaissance's right as landlord under the sublease to recover its remediation costs from its tenant. See Lech v. State Farm Ins. Co., 335 N.J. Super. 254, 258 (App. Div. 2000) ("[w]hile an assignee's rights can be no greater than those of the assignor, neither can they be any less" (internal citation omitted)).

Under the sublease assignment, Pathmark unquestionably assigned all of its "right, title and interest" in the sublease with Kyungin to Renaissance. That sublease required Kyungin to "comply with any and all federal, state and local laws or regulations with respect to Hazardous Substances" as defined in the Comprehensive Environmental Responses, Compensation and Liability Act of

1980 and, "at its sole cost and expense," to comply with the provisions of the Environmental Cleanup Responsibility Act and any orders or directives of the DEP. The sublease also provided that in the event of a breach by the sublessee, the sublessor "in addition to any other remedies it may have, . . . may recover from Sublessee all damages it may incur because of such breach." It thus seems readily apparent Renaissance could sue Kyungin to recover the remediation costs Renaissance incurred in 2009 on account of Kyungin's alleged breach of its obligation to comply with the environmental laws — without regard to whether the breach occurred before or after the assignment to Renaissance in 2007.

Renaissance adduced no evidence at the proof hearing that any or all of the contamination occurred post-assignment, but only that Kyungin was still using PERC, illegally, in 2009. It made no effort at that hearing to date the contamination and apparently was not required to do so to establish Kyungin's liability under the sublease — which was done after default and without opposition. Moreover, Renaissance's position at the hearing that Kyungin was the sole discharger, based on Renaissance's erroneous belief that Kyungin had been the only operator of the dry cleaners, is not inconsistent with its position that some, or all, of the contamination occurred before November 2007,

because Port-Man does not dispute Kyungin operated the dry cleaners from 1992 until 2009.

Accordingly, we find no fatal inconsistency between Renaissance's positions in the two proceedings and thus no basis for the application of judicial estoppel. In addition, application of this equitable doctrine, see Bahrle v. Exxon Corp., 279 N.J. Super. 5, 22 (App. Div. 1995), was particularly inequitable here. In the default hearing before Judge Kapalko, Renaissance was attempting to recover the more than $300,000 it voluntarily spent to clean up the property in 2009 — costs it concedes it cannot recover from Port-Man under the Lenco lease.

Port-Man has thus already received a substantial benefit from Renaissance's remediation efforts. Application of the doctrine here, allowed Port-Man to parlay that voluntary act on Renaissance's part into Renaissance having to assume the entire costs of cleanup without Port-Man having to establish when the contamination occurred, notwithstanding the judge's unequivocal finding that Renaissance is only responsible for lease liabilities accruing after the effective date of its assignment.

In invoking judicial estoppel, the judge improperly relieved Port-Man of its burden to establish a critical element of its cause of action to recover all of

its remediation costs from Renaissance and require it to fund the remaining cleanup — that all the contamination occurred after Renaissance assumed possession in 2007. Port-Man has never asserted that's the case, and indeed has several times in the course of these proceedings, including in its complaint, asserted the opposite.[5] Indeed, as we confirmed with counsel at oral argument, Port-Man never offered any proof regarding the timing of the discharge and contamination because its theory — that the 1971 Lenco lease prohibited partial assignments and thus obligated Renaissance to assume responsibility

---

[5] Port-Man alleged in its complaint that Renaissance "knew or had reason to know at the time it purchased the leasehold in 2007, that hazardous materials had been discharged onto and into the Demised Premises" and that the "dry cleaner sub-tenant continued to discharge hazardous materials" after Renaissance took possession. In its brief in support of its failed summary judgment motion against Renaissance, Port-Man asserted Renaissance took its lease "assignment on November 14, 2007 — presumably after much of the contamination had occurred." Port-Man also argued on that motion that Renaissance had included "pre-assignment contamination in its damages judgment in the prior litigation" against Kyungin. In its pre-trial memorandum, Port-Man contended because "sub-tenants of Renaissance and Pathmark contaminated the Property," Renaissance is liable, making irrelevant "whether and to what extent the contamination occurred before or after the Assignment of the Lease from Pathmark to Renaissance."

A-1454-18

for liabilities pre-dating as well as post-dating the assignment — meant Renaissance was responsible regardless of when the contamination occurred.[6]

We affirm the court's judgment that Renaissance is not liable to Port-Man for any obligations under the Lenco lease arising on or prior to November 14, 2007. We reverse the application of judicial estoppel, and because Port-Man failed to establish the contamination of the premises occurred after November 14, 2007, we reverse the judgment in its favor and remand for dismissal of its complaint. We do not retain jurisdiction.

Affirmed in part, reversed in part, and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[6] Port-Man's assertion that Renaissance established the contamination occurred in 2009 at the default hearing based on Grelis's testimony that he saw Kyungin using PCE during his 2009 site inspection, fails for the same reason the judge stated she granted summary judgment to Baik Yang: establishing use of a hazardous substance does not prove a discharge and contamination. See Atl. City Mun. Utils. Auth. v. Hunt, 210 N.J. Super. 76, 96 (App. Div. 1986) ("The pouring of hazardous waste on the ground was a discharge. The placement of the waste stored in containers was not a discharge.").

A-1454-18